## THE STATE v. WELSOR, *Appellant.*

·In Banc, November 6, 1893.

1. **Constitution:** JURORS: ST. LOUIS SPECIAL LAW. Section 9, article 21 of the special law relating to juries in the city of St. Louis (Revised Statutes, 1889, p. 2162), which disqualifies persons to serve as jurors who cannot read and write the English language, is constitutional.

2. **Criminal, Practice:** JUROR: INSANITY. One otherwise competent is not disqualified to serve as a juror on a murder trial because of aversion to the plea of insanity.

3. ———: JUROR SLEEPING DURING TRIAL: APPEAL. Where the trial court has heard the evidence and passed on the question, whether one of the jurors slept during a part of the trial, its finding will not be disturbed on appeal.

4. **Criminal Law:** MURDER IN FIRST DEGREE. The evidence in this case, *held,* sufficient to support a conviction of murder in the first degree.

5. ———: EVIDENCE. DYING DECLARATIONS. Dying declarations made under·the sense of immediate dissolution are admissible in evidence.

6. ———: ———: ———. Statements contained in such dying declarations as to the motive for the homicide should be excluded on proper objection.

7. ———: ———: ———: PLEA OF INSANITY. Where the defendant on trial for murder relies on insanity as a defense, the fact of the killing is thereby conceded, and the erroneous admission of dying declarations is immaterial.

8. ———: ———: SPECIFIC ACTS: CHARACTER. Evidence of specific acts of defendant was inadmissible for the purpose of showing his disposition.

9. ———: INSANITY: EXPERT EVIDENCE. An expert testifying as to defendant's insanity should be interrogated separately as to his opinion founded on a hypothetical case, and one derived from his personal knowledge of the accused.

10. **Criminal, Practice:** JUDICIAL DISCRETION. It is a matter within the discretion of the trial court to consider affidavits filed out of time in support of the motion for a new trial.

11. ———: NEWLY DISCOVERED EVIDENCE. Newly-discovered evidence, material only for the purpose of contradicting a witness, is not sufficient ground for a new trial.

12. ———: IMPROPER REMARKS OF ATTORNEY: APPEAL. Improper remarks of an attorney in his argument to the jury are not available on appeal where objection was not made to them at the time, and the attention of the lower court was not called to them.

13. ———: MOTION FOR NEW TRIAL. The motion for a new trial does not, of itself, prove any fact not shown by the record.

*Appeal from St. Louis Criminal Court.*—HON. J. C. NORMILE, Judge.

AFFIRMED.

*Charles T. Noland* for appellant.

(1) The court erred in sustaining the state's challenge to juror Alterange on the sole ground that he could not read and write the English language. Constitution, art. 2, sec. 28; *Nolen v. State,* 9 Tex. App. 419; *Trinidad v. Simpson,* 10 Cent. L. J. 149. (2) The court erred in overruling defendant's challenge to juror Charles Scott. *State v. Brooks,* 92 Mo. 542; *State v. Culler,* 82 Mo. 623; *State v. Bryant,* 93 Mo. 279. (3) The court erred in refusing a new trial because of juror Bickerford's sleeping while important evidence was introduced—which fact was unknown at the time by defendant. *Oleson v. Meader,* 40 Iowa, 662; *McDaniels v. McDaniels,* 40 Vt. 363; 2 Thompson on Trials, sec. 2620; *Norwell v. Devall,* 50 Mo. 272. (4) The verdict is so contrary to the evidence that it

must be ascribed to prejudice. *State v. Prim*, 98 Mo. 368; *State v. Castor*, 93 Mo. 242; *State v. Jaeger*, 66 Mo. 173. (5) The evidence of Mollie Green as to what Mrs. Manning said to her in defendant's absence was not admissible as a dying declaration or as a part of the *res gestæ*. Among others, these were especially objectionable: "Mollie, he shot me for my money. Don't forget that;" and: "He came in, demanded the money, and I wouldn't give it up, and he kept shooting me to make me give it up." These were simply guesses as to what motive actuated defendant. *State v. Simon*, 50 Mo. 370; *State v. Vansant*, 80 Mo. 67; *State v. Elkins*, 101 Mo. 344; *State v. Wensall*, 98 Mo. 137; *State v. Parker*, 96 Mo. 382; *State v. Chambers*, 87 Mo. 406. (6) It was error to refuse to permit defendant to show what his disposition was for peace and quiet. (7) It was error for the state to ask whether defendant wasn't morally capable of recognizing the rights of property. (8) It was error to refuse to permit Dr. Bauduy to testify that his opinion as to defendant's insanity, based on a personal examination, was strengthened by an examination into his history to see whether defendant was feigning insanity. *State v. Redemeier*, 71 Mo. 180 (9) The trial court erred in refusing to consider the affidavits of Thomas Koring and Charles Noland in rebuttal of the affidavits filed by the state. *Howland v. Reeves*, 25 Mo. App. 458; *State v. Bailey*, 94 Mo. 311. (10) The court erred in its instructions to the jury. (11) The court erred in refusing instructions numbered 1 and 2 offered by defendant. *State v. Kotovsky*, 74 Mo. 247. (12) The court erred in refusing defendant a new trial upon the ground of newly-discovered evidence, to the effect that a lady named Hall was in the room with Mrs. Manning after she was shot, and before Mollie Green returned with the beer, and that Mrs. Manning had no such

conversation with Mollie Green as testified to by her. *State v. Murray*, 91 Mo. 95; *State v. Wheeler*, 94 Mo. 252; *State v. Bailey*, 94 Mo. 311. (13) The circuit attorney in his closing address to the jury made such improper remarks as should cause the reversal of this case. *State v. Young*, 99 Mo. 66; *State v. Kring*, 64 Mo. 591; *State v. Lee*, 66 Mo. 165. (14) The trial court erred in overruling defendant's motion for a new trial and in arrest of judgment.

*John M. Wood*, Attorney General, and *A. C. Clover*, Circuit Attorney, for the state.

(1) The challenge to juror Scott was properly overruled. The juror's opposition was to a bogus plea of insanity, and he distinctly stated that he had no prejudice in this case and would fairly try the prisoner's plea. *State v. Baber*, 74 Mo. 292; *State v. Pagels*, 92 Mo. 300. (2) The state's challenge to juror Alterange was properly sustained. A man who cannot read the instructions of the court should not be allowed to sit on a jury, and the statute disqualifies him. 2 Revised Statutes, appendix, sec. 9, p. 2162. (3) The statute giving the state fifteen peremptory challenges in cities having over one hundred thousand inhabitants is not unconstitutional. *State v. Hayes*, 78 Mo. 344. (4) It is not necessary to swear the officer in charge of the jury until the argument of counsel has closed. *State v. Underwood*, 76 Mo. 630. And, in the absence of evidence that either the officer in charge or anyone else had any communication with the jury, the verdict should not be set aside because the officer did not take the special oath required by the statute. *State v. Hayes*, 78 Mo. 600; *State v. Hayes*, 78 Mo. 307. (5) Where the fact of the killing is abundantly established by the evidence, as well as by

the admission of the defendant in a case where the plea of insanity is interposed, it is immaterial whether testimony as to the dying declarations of the deceased was properly introduced in evidence or not. *State v. Pagels*, 92 Mo. 300. (6) It is well settled that a new trial will not be granted on the ground of newly-discovered evidence which is simply intended to contradict the testimony of a witness at the original trial. *State v. Ray*, 53 Mo. 345; *State v. Butler*, 67 Mo. 59; *State v. Smith*, 65 Mo. 313; *State v. Rockett*, 87 Mo. 666 (7) The trial court had the undoubted right to refuse to consider affidavits in support of the motion for new trial filed after the time. See *Seaton's case*, 106 Mo. 198. (8) The affidavits on the part of the state flatly contradicted those for the defense as to the alleged misconduct of juror Bickerford. The trial court found against the defendant, and its finding should be as conclusive upon this point as in a case of alleged prejudice on the part of a juror, or other misconduct. *State v. Blumb*, 19 S. W. Rep. 650. (9) The instructions asked by defendant were most properly refused: they suggested a theory abhorrent to the established doctrine in this state. *State v. Pagels*, 92 Mo. 317; *State v. Miller*, 20 S. W. Rep. 243. (10) The alleged improper remarks of counsel appear only in an affidavit filed by defendant's counsel. There was no exception saved at the time, and the attention of the trial court was first called to them in the motion for new trial. *State v. Hayes*, 81 Mo. 574; *State v. Pagels*, 92 Mo. 300; *State v. Taylor*, 98 Mo. 240.

BURGESS, J.—At the November term, 1890, of the criminal court of the city of St. Louis, appellant was indicted for murder in the first degree for shooting and killing one, Clementine Manning, with a pistol, in the city of St. Louis on August 4, 1890. He was tried and

convicted of murder in the first degree at the October term, 1891.   The indictment is in the usual form, and no objection is taken to it.

Motions for new trial, and in arrest of judgment were filed in proper time, and were overruled.   The case is brought to this court by appeal.

One, Earnest Alterange, summoned as a juror, stated on his *voire dire* that he could not read and write the English language, and, on the challenge of the state, was rejected, over the objection and exception of appellant.   One, Charles J. Scott, summoned as a juror, stated on his *voire dire* that he had no prejudice against the prisoner; had never heard of the case, and could go into the jury box without any prejudice against the prisoner, and listen to the evidence, give it its proper weight, and that if reasonably satisfied that defendant was insane, would find him not guilty.   Appellant's challenge to this juror was overruled.

The evidence tended to show that deceased and her sister lived together on the first floor of a house in the city of St. Louis; that deceased and appellant had once lived together in illicit relation, but that they had quarreled and separated and that he had not called on her for over a year.   On the fourth of August, 1890, about noon, deceased had been to market and was on her way home when appellant, who was in a buggy, followed her to her house.   He got out of the buggy and went into the house with her.   He shook hands with her sister, who was in the room at the time, and sent her to a neighboring saloon for beer; she was gone but a few minutes, and on her way back she heard several pistol shots, and when she got in the house found deceased lying on the bed in great agony, bleeding, and saw appellant leaving the house by way of the front door with a pistol in his hand.

The first to reach the house was a blacksmith. Appellant asked him to get in the buggy and ride to the police station with him and they both entered the buggy and started in that direction, but had gone but a short distance when a police sergeant met them and put appellant under arrest. The officer took the pistol from appellant, took him back to the house in the presence of deceased, who identified him as the man who had shot her. Appellant was asked by the officer why he shot her and his reply was, "Well, I shot her and it didn't matter why." The officer remarked "You have done a good job," to which appellant replied, "Yes, it makes a man good in his business to do a good job.  *  *  *  I shot her and they can take me out and put a rope around my neck as soon as they want to." Deceased died within an hour after she was shot. She received a fatal shot in the back, penetrating the kidneys, liver, small intestines, diaphragm and left lung; the abdominal cavity and left pleural cavity were found filled with clotted blood. The defense was insanity. Defendant was not sworn as a witness.

1. Numerous causes are assigned by appellant's counsel why the case should be reversed. It is urged that the trial court committed error in excusing from the jury, over defendant's objections, one, Alterange, who answered on his *voire dire* touching his qualifications as such juror, that he could not read and write the English language. The contention is that section 9, article 21, Appendix Revised Statutes, 1889, p. 2162, which disqualifies persons from serving as jurors in the city of St. Louis in criminal cases, because of their inability to read and write the English language, is in conflict with article 2, section 28, of the constitution of this state, and that, unless section 9, *supra*, is

valid, the court had no power or authority to excuse him on the ground stated.

The article of the constitution referred to simply guarantees to every one the right of trial by jury, nothing more. It does not in any way undertake to prescribe the qualifications of jurors in the city of St. Louis. If there was no statute defining the qualifications of jurors in the city of St. Louis, then we concede that it would have been the exercise of doubtful authority for the court to exclude a person, possessing other necessary qualifications, from jury service over the objections of defendant because he could not read and write the English language. But we are relieved from any embarrassment of that kind in this case, as the qualifications of jurors are defined by section 9, *supra*, and Alterange, who was examined as a juror, came within its express provisions. The legislature had the same right to provide that one who cannot read and write the English language shall not be a qualified juror, as it had to say, that lawyers, doctors, clergymen and persons of different trades, occupations and stations in life should not be qualified to sit on juries.

Section 3240, Revised Statutes, 1889, provides that all proceedings and records in any court of record shall be kept in the English language, and section 4208 provides, that in the trial of criminal cases, the court must instruct the jury in writing. These provisions of the statute are mandatory, and when we consider that all of our proceedings in courts are kept in the English language; that the jury have the right to take the instructions of the court to their room when they retire to consider of their verdict, it would seem to furnish a conclusive argument of the wisdom of the legislature in passing the act disqualifying persons as jurors who cannot read and write the language

in which they are written. *State v. Thompson*, 83 Mo. 257. Not only this, but section 9, *supra*, makes it *the duty* of the court to excuse from jury service all persons who are not qualified to act as such according to its provisions. There is no apparent conflict, so far as we are able to see, between section 9, *supra*, and article 2 of the state constitution, nor do we think there is any in fact.

2. It is also insisted that the court committed error in retaining one, Scott, on the panel of jurors against the objections and exceptions of appellant. Scott, on his *voire dire*, stated that he did not know the defendant, nor did he know anything about the case. That, while he was prejudiced against the bogus plea of insanity, and had mighty little use for it, that he had no prejudice against the defendant, and could give him a fair and impartial trial, and that if his plea of insanity was estabished to his reasonable satisfaction that he would find him not guilty. He was not disqualified as a juror because of his aversion to the plea of insanity. *State v. Baber*, 74 Mo. 292; *State v. Pagels*, 92 Mo. 309. Much is to be conceded in favor of the rulings of the trial judge in passing on questions of this kind, and it is sufficient if he is satisfied from the answers to the questions propounded that the juror is qualified, and that he will give the defendant a fair and impartial trial. Thompson and Merriam on Juries, section 258.

3. The question as to whether or not one of the jurors, Bickerford, was sleeping during a part of the trial, was one to be passed upon by the court in the motion for a new trial, and, it having done so after having heard the evidence, we are not prepared to say that its ruling was not correct and was not sustained by the facts in proof.

4. We cannot say that the verdict was not sustained by the evidence, and that it was the verdict of passion or prejudice. On the contrary, it was amply sustained by the evidence. The homicide was unprovoked, and of the most brutal character. The defense was well presented, and the instructions were such as have often been approved by this court, and submitted all the issues fairly to the jury. The defendant admitted the killing and undertook to excuse himself from its consequences by showing that he was insane at the time. The jury found that the defense was not sustained by the evidence, and we cannot say that their finding was incorrect.

5. Exception is also made to the ruling of the court in admitting testimony as to the dying declarations of deceased. That the proper foundation was laid for the admission of the statements we are fully satisfied, and the ruling of the court in admitting them fully sustained by the authorities. The statements were made under a sense of *immediate dissolution*, as amply shown by the evidence. Deceased had stated to her sister that she was dying, and evidently had no hope of recovery. We think, perhaps, the objection would have been well taken (had it been properly made) to the admission of the remarks by the deceased as to the motive with which the shooting was done. But these remarks came out merely as a part of the account of the homicide, and, when developed, no motion or request was made to strike out or exclude that part of it which related to the motive. The rest of the statement was plainly competent, and there is no ruling or exception saved to the admission of that part of the dying declaration alluded to. So far as it gave only an account of the killing and identified the slayer, it comes within the ruling in *State v. Pagels*, 92 Mo. 309; for, as the killing was admitted by the defendant and

amply sustained by the evidence, it is immaterial whether the dying declarations were properly admitted or not.   Judge SHERWOOD, in delivering the opinion of the court in that case, says: "The fact of the killing of Kohn by the defendant was abundantly established by the evidence, as well as by the admissions of the defendant.   Indeed, the plea of insanity is itself, and of necessity, a plea in the nature of a plea of confession and avoidance, the courts differing as to the *quantum* of evidence to sustain such plea.   1 Wharton on Criminal Law [9 Ed.], sec. 61.   Such plea is but a bare denial of a *part of* the government's case; it admits the *act* charged, but avers there was no criminal intent accompanying the act, and, therefore, denies the crime charged.   2 Bishop on Criminal Procedure [3 Ed.], section 669.   This being the case, it is wholly immaterial to discuss the point, whether testimony as to Kohn's dying declarations was properly received in evidence, since these declarations only went to an admitted fact, to-wit, the homicide."   This is the last expression of this court in regard to the admission of dying declarations where the defense was the plea of insanity, and we are entirely satisfied with the views therein expressed.

    6. Nor did the court err in excluding evidence as to specific acts of defendant for the purpose of showing his disposition.   Evidence of his general character for peace and quietude would have been admissible, but no such evidence was offered.   And the statement was made by appellant's counsel that such was not the purpose of the inquiry.

    7. Dr. Bauduy was examined as an expert on behalf of appellant, who, after having testified to his experience in the treatment of the mind and nervous diseases, so as to qualify him as such expert, stated, on an hypothetical case, that, in his opinion, defendant was

insane. Subsequently appellant's counsel asked him to state his opinion as to the condition of appellant's mind at the time of the homicide, judging from a personal examination which he had had of him in jail since the homicide was committed, and the hypothetical case, upon which he had already expressed his opinion. The court ruled, over the objection of defendant's counsel, that the question was improper, and that the hypothetical case and the personal examination could not be confounded in the same question. He was then asked by counsel for appellant to give the result of his personal examination of appellant while in jail, but he gave no answer to the question.

The ruling of the court was manifestly correct, for the reason that when the witness was testifying as an expert on the hypothetical case put to him, he was required to give his opinion as to the condition of defendant's mind at the time he committed the homiicide, based mainly on facts proven to have occurred, when, while in giving his opinion as to the condition of defendant's mind at the time he made the personal examination, he was doing so, based on what occurred afterwards, and was really no evidence, if so, very little, as to the condition of defendant's mind at the time of the homicide. Mr. Rogers, in his work on expert testimony, page 75, quotes with approval from *State v. Felter*, 25 Iowa, 75, as follows: "But if a physician visits a person, and from actual examination or observation becomes acquainted with his mental condition, he may give an opinion respecting such mental condition at that time—that is, he may, under such circumstances, state to the jury his opinion as to the sanity or insanity of the person at the time when he thus observed or examined him."

8. We can see no well founded objection to the question propounded by the state to the witness,

Wardlow, nor can we see how the defendant could have been affected thereby. The objection seems to be more technical than real.

9. The court had given time to the state to file counter-affidavits to those which had been filed by appellant for the purpose of showing that one of the jurymen was sleeping during the trial, and after the time had expired, appellant asked to file affidavits in rebuttal to those filed by the state, which the court declined to permit. It was a matter within the broad discretion of the court, whether it would consider the affidavits filed by appellant out of time or not, and we are not prepared to say that it was an abuse of its discretion when it declined to do so.

10. It is further insisted that appellant's motion for a new trial should have been sustained on the ground of newly-discovered testimony and the affidavits of Lee Berring, Mr. Charles Noland and the defendant, himself, were filed in support of the motion. Mr. Berring states, in his affidavit, that he heard one, Mrs. G. W. Hall, say in substance that, as soon as the shot was fired that killed Mrs. Manning, she ran into the room and found her lying on the bed in great agony, and that after she got there deceased's sister, Mollie Green came in and sent for several doctors, and that she, Mrs. Hall, remained with the deceased until they came, and that at no time did the deceased make any statement to Mollie Green or anyone else as to the shooting, who did it, or the cause of it. Mr. Noland and the defendant both state that they did not know of this newly-discovered evidence, until after the trial and that they had no means of knowing.

In the case of *State v. Ray*, 53 Mo. 349, Judge SHERWOOD, in delivering the opinion of the court, says: "In the *State v. McLaughlin*, 27 Mo. 111, this court adopts, with most cordial approval, the rules as

laid down in *Berry v. State*, 10 Ga. 511, by Judge Lumpkin in respect to new trials, on the ground of newly-discovered evidence, as follows: 'The application must show, *first*, that the evidence has come to his knowledge since the trial; *second*, that it was not owing to the want of due diligence that it did not come sooner; *third*, that it is so material, that it would probably produce a different result if the new trial were granted; *fourth*, that it is not cumulative; *fifth*, that the affidavit of the witness, himself, should be produced, or his absence accounted for; *sixth*, that the object of the testimony is not merely to impeach the character or credit of a witness.' " See, also, to the same effect, the *State v. Rockett*, 87 Mo. 666; *State v. Butler*, 67 Mo. 63; *State v. Carr*, 1 Fost. (N. H.) 166.

This evidence could only have been material for the purpose of contradicting the witness, Mollie Green, and comes within the rule laid down by the authorities above cited. It could not have produced a different result in the trial, because defendant admitted the killing, himself, on different occasions and to different persons.

11. It is also urged by appellant's counsel that a new trial ought to have been granted because of the remarks of the circuit attorney in his closing speech to the jury, which, if correctly set out in the affidavit filed, were on the very verge of impropriety, if not entirely so. But, as it does not appear from the bill of exceptions that they were objected to at the time and the attention of the court called to them, there is nothing before us to review upon this assignment. The *State v. Pagels*, 92 Mo. 300; *State v. Taylor*, 98 Mo. 240; *State v. Hayes*, 81 Mo. 574. The motion for a new trial alone does not prove any fact not shown by the record, and that question seems to be well settled by repeated rulings of this court. *State v. Bulling*, 105 Mo. 226.

We have examined all the evidence and instructions carefully, and find no error which could have prejudiced the defendant. The trial seems to have been fair, the instructions unobjectionable, and the verdict of the jury justified by the evidence. The judgment is affirmed. All concur.