## THE STATE v. TAYLOR, *Appellant.*

### Division Two, February 12, 1895.

1. **Criminal Practice**: MURDER : INDICTMENT. An indictment for murder is not defective because it charges that a revolver loaded with one leaden bullet inflicted two mortal wounds.

2. ———— : EVIDENCE : DEFENDANT'S STATEMENT : PRACTICE OF CORONER'S OFFICE. A coroner's stenographer, who reported the inquest, may, for the purpose of showing that the defendant voluntarily made his statement thereat, testify to the uniform method pursued in the coroner's office when a prisoner makes a statement, though he does not remember that such method was observed in the case of the defendant.

3. ———— : EVIDENCE. On a trial for murder by shooting, it is proper to exclude evidence that the defendant carried a pistol because a person other than the deceased and who was not present at the homicide and was not connected therewith, had threatened his life.

4. ———— : NEW TRIAL : NEWLY DISCOVERED EVIDENCE. A new trial will not be granted to enable a party to introduce newly discovered evidence which merely contradicts or impeaches a witness.

5. ———— : ————. An affidavit filed after the motion for a new trial was denied, and which affidavit was not passed on by the trial court, will not be considered on appeal.

6. ———— : MURDER IN FIRST DEGREE : INSTRUCTIONS. A conviction of murder in the first degree will not be set aside because the court in defining "premeditatedly" omitted the word "beforehand," where it correctly defined "deliberately" and "malice aforethought" which include premeditation.

*Appeal from St. Louis Criminal Court.*—HON. HENRY L. EDMUNDS, Judge.

AFFIRMED.

*Charles T. Noland* and *Frank H. Braden* for appellant.

(1) The indictment charges an absurdity. It alleges that the pistol was loaded with "one leaden bul-

let," and that with said pistol so loaded the defendant shot Tobe Carlyle and inflicted two mortal wounds, from which he died. *State v. Gray*, 21 Mo. 492; *State v. Edwards*, 70 Mo. 480; *State v. Flint*, 62 Mo. 393. (2) The evidence of the coroner's stenographer was inadmissible. (3) As explanatory of his being armed with a pistol at the time of the homicide, it was error to refuse to allow defendant to show that his life had been threatened by Alfred Kearney and thus under section 3502, Revised Statutes, 1889, defendant was authorized by law to carry such weapon. (4) The definition of the term "deliberation" was not in accord with the definition of that word as given by this court in other cases, and was misleading to the jury and erroneous. *State v. Kotovsky*, 74 Mo. 247; *State v. Ellis*, 74 Mo. 207; *State v. Curtis*, 70 Mo. 597. (5) In the definition of "premeditation" the word "beforehand" or some word expressing the same meaning was omitted, and thus, if the jury believed the defendant thought of the killing after it was done, they were, in effect, told that it constituted premeditation. *State v. Mitchell*, 64 Mo. 191; *State v. Lane*, 64 Mo. 319; *State v. Dearing*, 65 Mo. 530; *State v. Lewis*, 74 Mo. 222; *State v. Ellis*, 74 Mo. 207; *State v. Harris*, 76 Mo. 361; *State v. Landgraf*, 91 Mo. 97. (6) The court did not fully instruct the jury upon the law of the case. The defendant testified that he suspicioned his wife of unfaithfulness, and of being intimate with other men, and where he found her under circumstances which convinced him of her guilt he became excited and chided Carlyle with having debauched his wife. That he had never met Carlyle before, but had heard of him in connection with his wife, and that the quarrel and subsequent homicide arose from these facts. The court should have instructed the jury upon this theory of the case, even if the defendant did go further and testify

that Carlyle fired the first shot and that he, Taylor, acted in self-defense. (7) The court should have granted a new trial upon the affidavit showing that Clyde Taylor, the ten year old son, had committed perjury through the influence of his mother and aunt.

*R. F. Walker*, Attorney General, and *C. O. Bishop* for the state.

(1) The indictment is sufficient, and is in the form so often approved; there is no error apparent upon the record. (2) There was no testimony admitted over the objection of the appellant, which was incompetent or in any case prejudicial to him. And the only testimony offered by him and ruled out by the court was grossly incompetent: *First*. Because it was immaterial whether any person other than the deceased had threatened the appellant's life; and, *second*, it was wholly immaterial why he carried a revolver. (3) The instructions covered all the law of the case, and were such as have been so often approved. (4) The affidavits filed by the appellant in support of his motion for new trial are all (except his own and his attorney's) intended to impeach the boy, Clyde Taylor. It is the established rule in this state that newly discovered evidence which is merely calculated to contradict that given on the trial, or to impeach a witness for the state, is not such as is contemplated by the statute, and will not work a reversal. *State v. Howell*, 117 Mo. 307; *State v. Welsor*, 117 Mo. 570. But a review of these affidavits will disclose that they are wholly unworthy of consideration by this court as ground for reversal. (5) The court instructed the jury on murder in the first and second degrees, and necessary self-defense, competency of defendant as a witness, credibility of witnesses and reasonable doubt. No instructions were

asked by appellant, and, therefore, the court did not err in refusing any.

GANTT, P. J.—The defendant was indicted at the May term, 1893, of the criminal court of the city of St. Louis, for the murder of Tobe Carlyle in the city of St. Louis, March 13, 1893. He was duly arraigned at the October term, 1893, and a plea of not guilty entered in his behalf, and he was tried and convicted of murder in the first degree.

The testimony on behalf of the state tended to show, substantially, the following: The defendant, a negro man, was a barber by occupation, with a wife, and a son nine years old; they had been living some little time with his wife's sister at 1533 Gratiot street, St. Louis; defendant was of intemperate habits and frequently quarreled with his wife, and, finally, left her about a month before the homicide. The sister-in-law, one Ida Anderson, unmarried, maintained herself by washing and ironing and by furnishing meals to Pullman employees on trains running into the city. The deceased was a young negro man, porter of a chair car on the Chicago & Alton railroad and lived in Chicago; he had been running into St. Louis about a week, and, a few days before the homicide, had been brought to Ida Anderson's by one of her regular patrons, who was a cousin of his; and, on the morning of the homicide, he made his second call at the house, having come in on his train that morning; he came in late, his train being behind time, and when he reached the house he found Ida Anderson ironing; she stopped her work and got breakfast for him.

After eating his breakfast, he put on his hat, took up his overcoat and lighted a cigar. Just then the appellant came up the stairway leading to the room where the meal had been served, and called out his lit-

tle boy.  The boy hung back, but appellant called to him: "Come here, Clyde; your papa didn't come here to hurt you; he only came here to hurt some of the damned sons of bitches that's hunting around your mother."  Deceased started down the stairs, but appellant barred the passage by placing his arm across and seizing the banister.  Deceased said: "My friend, I don't know you, and you don't know me; I don't want to have any trouble with you; you are not alluding to me, are you?  If I am in your house, and you don't want me here, let me go out."  Appellant replied: "No, I don't intend for you to come out, you son of a bitch; I'm going to kill you."  Ida Anderson stepped forward to pacify him, and at that moment appellant fired.  Deceased fell immediately back into the room, and appellant stepped into the room and fired at him the second time as he was down.  A third shot was fired and the bullet went into the wall.  Appellant left the house immediately, carrying with him the overcoat of the deceased.  When the officers reached the house, after the shooting, deceased was in a sitting position, his back against the wall, between a bed and a chair; his hat was on his head, his eyes open and the cigar between his teeth.

The autopsy disclosed two bullet wounds, either of which was necessarily fatal, and producing death almost instantly.  One wound was in the median line of the throat, under the chin, and was powder burned, the bullet ranging downward, passing through the right lung and lodging in the back between the first and second ribs.  The second wound was on the right side of the head, three inches above the right ear, ranging diagonally across the skull, and lodging in the left lobe of the brain.  In the opinion of the medical expert the wound in the head was the first received.

It appeared that when deceased came to the house

he had a revolver in his overcoat pocket, its striking the frame of the bed calling the woman's attention to it, and he took it out and showed it to them. It was a small affair, belonging to a woman in Chicago; was not loaded, and he took it apart to show the woman how it worked. This revolver was picked up from the floor near deceased, after the shooting, and turned over by the police to the coroner, and it was unloaded at the time.

The appellant was arrested by an officer, who started in pursuit from the scene, a short time after the shooting, several blocks away. When overtaken by the officer, he said: "I guess I know what you got me for." He turned over his weapon to the officer and was taken to the station. The son of appellant testified as an eyewitness, and in every particular corroborated the testimony of Ida Anderson, and was subjected to a long and rigid cross-examination.

On the part of appellant, there was testimony to the effect that, though given to liquor, his general reputation for peace and quiet was good; also, testimony to the effect that his nine year old son (the witness for the state) had a bad reputation, but that his veracity had not been questioned; and there was some little testimony that Ida Anderson's reputation for truthfulness was not good.

The appellant, testifying in his own behalf, gave this version of the homicide: He went to the house of his sister-in-law that morning to see his little boy, whom he had not seen for several days; as he went up the steps his sister-in-law saw him and cried out, "Oh, Grace, Grace! here is Will" (Grace being appellant's wife), and at this exclamation the wife opened the door of a room at the head of the stairs and looked out; she was clad only in her chemise, and behind her was the outline of a form, which appellant took to be that

of a man; the sister-in-law exclaimed, "You yellow son of a bitch, don't you come up here?" and undertook to shove him back; he retorted, "Now you can't say you're not making a whore of my wife," and they began quarreling. Then deceased came out, followed by the wife, deceased having a gun in his hand, and she carrying his overcoat; and then began another wordy quarrel between the three; the wife struck him and threw the overcoat over his head, and deceased fired, appellant drew his pistol and fired, shooting until the chambers were empty; and when he got the coat off his head his sister-in-law had disappeared; his wife cried out, "My God! I believe he has killed the man," and just then the little boy came running in, inquiring of his mother what was the matter. Appellant claimed to have remained there four or five minutes after the shooting, talking with his wife, and that his sister-in-law said to him: "You son of a bitch, if it is the last act of my life, I'm going to have you hung," and he then left the house.

I. The indictment is sufficient and fully informed the defendant of the nature and cause of the accusation against him. The objection now made that it is an absurdity because it alleges that the revolver was loaded with *one* leaden bullet, with which *two* mortal wounds were inflicted, is without merit.

II. When the witness, Robinson, the stenographer for the coroner's office, was testifying he stated that the defendant had testified at the coroner's inquest on the body of Tobe Carlyle. He acted as reporter of the inquest. He was then asked if defendant voluntarily gave his statement on that occasion. He answered: "I don't remember that. If I am allowed to state I can tell what is done always, in every case." *Q.* "How is that?" *A.* "I say, if I am allowed, I can tell the methods pursued by the coroner in every case when a

prisoner is called up to testify." To this statement defendant objected. Witness then stated that the method or custom to which he referred had been invariable without an exception in his experience in the office. To this it was objected that it was not germane and nothing but what pertained to this case was competent. The court thereupon ruled that he might answer. He then answered, "In every case where a prisoner testified, before testifying, the coroner or deputy who is holding the inquest asks the prisoner whether he desires to make a statement under oath or without being sworn. He is also informed at the same time, that he can either make a statement or refuse, just as he sees fit."

The stenographer then identified the statement of the prisoner made at the inquest and testified it was a correct, true, faithful and complete transcript of the defendant's evidence on that occasion, to which no objection was made nor exception saved.

It was entirely competent and proper for the witness to state what the uniform practice in the coroner's office had been. It is a character of evidence resorted to every day in our courts and often the most satisfactory. It is in this way that accounts are proven, and engineers and firemen are daily allowed to state their custom as to ringing bells or sounding the whistle in approaching crossings. *Mathias v. O'Neill*, 94 Mo. 520.

III.    Defendant complains that he was not allowed to prove that one Kearney, who was not present at the homicide, had threatened his life, and this as a justification for carrying the pistol. The court properly excluded this. For the purposes of this trial it was wholly immaterial that Kearney had threatened his life, as Kearney was not present and had no part in the killing. Nor did it matter why he carried a pistol.

He was not being tried under the charge of carrying concealed weapons. He might have been lawfully carrying a pistol but that would not justify him to use it feloniously upon Carlyle. The proposed inquiry could have thrown no light on the transaction. The question was, what justification or provocation had he for using it to kill Carlyle.

IV. It is next complained that the court erred in not granting a new trial on the newly discovered evidence. The burden of all this evidence was to impeach the evidence of Clyde Taylor, the son of defendant. It is unnecessary to consider this at length. It is the established rule in this state that a new trial will not be granted to enable a party to introduce newly discovered evidence which merely contradicts or impeaches that given on the trial or to impeach a witness. *State v. Howell*, 117 Mo. 307; *State v. Welsor*, 117 Mo. 570.

. These affidavits themselves are such as call for close scrutiny by the courts. The appellant's affidavit is that the facts stated in the affidavits of Willis Elijah Brown, Garrett Johnson, Daniel Brown, Jerry Henderson and Buanna Henderson came to his knowledge after the trial; said parties, after learning the verdict, came to affiant and his counsel and informed them of the facts, etc. Now, these parties named all give their affidavits at Clarksville, in Pike county, and not in St. Louis. They all purport to give a conversation of the boy Clyde, on the same day (Sept. 17) in Clarksville, in which he is deposed to have said that he was not present at the shooting, but was going to St. Louis to testify against his father, by reason of fear. The conversation is stated by Buanna Henderson to have occurred in her house; by Daniel Brown to have occurred in his house; by Willis Elijah Brown to have occurred in his house; by Jerry Henderson to have occurred at his house; and by Garrett Johnson to

have occurred in the city of Clarksville, but at no house in particular.

The affidavit of Tony Demartine avers that he had a conversation in St. Louis with the boy, "about the last week in March or first week in April, 1893," *seven months before the trial,* in which the boy stated that he was not present at the shooting, but had been sent on an errand by his mother at the time, and that he was compelled by his aunt to testify as he did at the coroner's inquest.

The affidavit of Kurt Von Reppert states that he had a conversation with the boy during the first week in April, 1893, in which the boy said he was going to testify against his father *(who was not indicted until May 16),* because his aunt had threatened him with punishment and he was afraid of her. The affidavit of Anne Renfrow states that she heard a conversation between Clyde and certain unknown parties during the coroner's inquest, in which he stated that he was not present when his father killed Carlyle, as his mother had sent him on an errand and he did not return until after the shooting.

The strangest affidavit of all, however, is that of one Ben Huhn, who swears that in August, 1893, at the city jail in St. Louis, he heard a conversation between Clyde and *his father (the appellant),* and heard Clyde say he did not see the shooting, but that his mother and aunt had threatened to punish him and send him to the house of refuge if he did not swear on the trial that he was present and saw the shooting. And yet, during a long and rigid cross-examination of the boy, this fact was not brought out, because, as appellant swears, appellant did not know of this conversation until after his trial.

The defendant himself does not swear that the matter contained in the affidavits of Tony Demartine,

Kurt Von Reppert and Ben Huhn were not known to him. It is inevitable that he knew of Ben Huhn's evidence or that Huhn had made a false affidavit.

The court very properly refused to set aside the verdict on this showing. A peculiar feature of the case is that, although the court gave time to file affidavits, the affidavit of Clyde Taylor was not filed until after the time had expired, nor until after the motion had been overruled. What function it is expected to perform in this record we can not understand. The criminal court was not asked to consider it and certainly we are not expected to do so. At any rate we shall not. It forms no part of any exception in the case.

V. The only complaint urged against the instructions relates to the definitions of "deliberation" and "premeditatedly." In all other respects the instructions are such as have been approved again and again by this court.

The definition of deliberation is in harmony with our decisions, but by some oversight the word "beforehand" was omitted from the definition of "premeditatedly," otherwise correct. It was held in *State v. Harris*, 76 Mo. 361, that when the defendant was convicted of murder in the second degree, as premeditation was an essential element of murder in the second degree, it was absolutely necessary that the word should be defined, and as it was defined to mean "thought of for any length of time however short," omitting the word "beforehand," it was error. But in this case, the defendant was convicted of murder in the first degree, and the court not only correctly defined deliberation, which includes premeditation (*State v. Dale*, 108 Mo. 205), but correctly defined "malice aforethought."

Now, we have on more than one occasion held that an indictment which omitted "premeditatedly" altogether, but used the words malice aforethought, was

sufficient, as malice aforethought was equivalent to malice and premeditation. *State v. Low*, 93 Mo. 547; *State v. Thomas*, 78 Mo. 327; *State v. Dale*, 108 Mo. 205.

The case was well tried. The defendant had the full benefit of his evidence, but the jury who saw and heard the witnesses evidently believed those testifying for the state, and, if they did, they were bound to find that the defendant, without provocation, shot and killed Carlyle, actuated by a feeling of jealousy.

The judgment is affirmed and the sentence of the law will be executed. All concur.