## THE STATE v. POLLARD *et al.*

### Division Two, February 4, 1896.

1. **Criminal Practice**: INSTRUCTIONS: EXCEPTIONS. Where no exceptions are saved to the giving of instructions, they will not be reviewed on appeal.

2. ———: EVIDENCE. Where the exclusion of evidence is not made a ground for new trial it will not be considered on appeal.

3. ———: ———: THREATS. It is competent on a trial for murder to show that defendants threatened, on the night of the murder, to kill the deceased before morning.

4. **Criminal Law**: MURDER IN FIRST DEGREE. The evidence in this case *held* sufficient to sustain a conviction of murder in the first degree.

*Appeal from Jackson Criminal Court.*—HON. J. W. WOFFORD, Judge.

AFFIRMED.

*Thomas N. Williams, Dee Rees,* and *Roberts & Roberts* for appellants.

(1) The court erred in its rulings on the evidence. The evidence of the alleged threats was inadmissible. Suppose Cahn had killed Pollard; any threats previously made by Pollard against Cahn would have constituted no excuse or justification, unless the threats had been communicated to Cahn, or some overt act had been committed by Pollard, indicating a present purpose to execute such threats. *State v. Harris*, 73 Mo. 287; *State v. Eaton*, 75 Mo. 586; *State v. Elkins*, 63 Mo. 159; *State v. Hays*, 23 Mo. 287; *State v. Harrod*, 102 Mo. 590; *State v. Taylor*, 64 Mo. 358. (2) Threats are but words, and words are no justification or mitigation of murder. *State v. Hays*, 23 Mo. 287. (3)

Neither are they of a battery. "One against whom threats have been made is not justified in assaulting the threatener, unless he made some attempt to execute his threats." *State v. Ryder,* 90 Mo. 54; *State v. Hays,* 23 Mo. 287; *State v. Elkins,* 63 Mo. 159. (4) "If a person threatened, with no excuse in the way of self-defense, because of outward demonstration against him, kills the party who made the threats, he will not be allowed to lay before the jury, by whom he is being tried, the known threats on which he bases his unlawful action." *State v. Clum,* 90 Mo. 482; *State v. Taylor,* 64 Mo. 358; *State v. Harris,* 73 Mo. 287; *State v. Eaton,* 75 Mo. 586. (5) The court erred in refusing a new trial, the evidence being insufficient to support the verdict.

*R. F. Walker,* attorney general, *Morton Jourdan,* assistant attorney general, and *W. T. Jamison* for the state.

(1) The court will not review the instructions in this case for the reason that no exceptions were saved to the action of the trial court in either giving or refusing to give any of the instructions, and the presumption will be indulged that they correctly declared the law. *State v. Gordon,* 117 Mo. 387; *State v. Foster,* 115 Mo. 448; *State v. Elkins,* 101 Mo. 345; *State v. Elvins,* 101 Mo. 243. (2) Nor will the court review the question as to whether or not error was committed by the trial court in failing to instruct the jury on all questions of law arising in the case or presented by the testimony, for the reason that no exceptions were saved to the failure of the court to so instruct. *State v. Paxton,* 126 Mo. 515; *State v. Cantlin,* 118 Mo. 111. (3) This court is again asked to interfere with the finding of the jury and of the trial court upon the testimony in

State v. Pollard.

this case, upon the ground that the verdict is against the weight of the evidence. It has been repeatedly held that this court will not interfere unless it is evident that there is an entire failure of proof. *State v. Fischer*, 124 Mo. 460; *State v. Schaefer*, 116 Mo. 96. (4) And that where inferences of guilt have been reasonably drawn from the evidence, a verdict will not be set aside upon appeal because of the insufficiency of the testimony. *State v. Sanford*, 124 Mo. 484; *State v. Banks*, 118 Mo. 107. (5) Nor will a verdict be set aside on appeal upon the ground that it is against the weight of the evidence, and the result of passion and prejudice upon the part of the jury, unless there be a total failure of proof to support it. *State v. Alfray*, 124 Mo. 393; *State v. Richardson*, 117 Mo. 585; *State v. Moxley*, 115 Mo. 644. The testimony shows conclusively the guilt of the defendants.

GANTT, P. J.—The defendants were jointly indicted by the grand jury of Jackson county at the January term, 1895, of the criminal court of said county, for the murder of Isaac Cahn. They were duly arraigned at the same term and each for himself entered a plea of not guilty. The cause was continued to the April term and as neither sought a severance they were jointly tried, and both were convicted of murder in the first degree and sentenced to be hung. They filed their motions for a new trial which were overruled and from their sentence they prosecute this appeal.

The following is believed to be a fair statement of the controlling facts as they appear of record:

The defendants, the deceased and all the witnesses except Dezootti and the police officers who testified, were negroes. On the night of December 17, 1894, a chitterling supper and dance was in progress at the

house of Mary Buchanan, a negro woman who lived in a house between Forest and Troost avenues on Belvidere street in Kansas City, Missouri, and two or three doors west of this house lived H. Clay McDonald and still farther west about three doors on the same side of the street was a saloon the front door of which opened on Troost avenue with the rear door opening on Belvidere street. Isaac Cahn was the agent for the owner of the building in which the supper was served and was present that night. About 10 or 11 o'clock that night the defendants put in their appearance at the supper and became involved in some kind of dispute with Cahn. Thereupon the women in charge of the supper requested the defendants to leave the house, which they did, but returned again. The evidence does not disclose that defendants and deceased Cahn were acquainted prior to that night or had ever had any previous difficulty.

The witness McDonald was the fiddler for the dance and testified that when the defendants returned to the supper that night, the defendant Harris walked toward deceased in the east end of the room and Pollard dropped behind the door and put his hand in his pocket and thereupon McDonald said to him, "Do not start anything here;" and Pollard said he would not, but said, "I am looking for my rights;" and Harris then said, "Yes, we are looking for our rights." The defendants then again left the house. After this they were met by McDonald going west in the direction of the saloon and Harris inquired of him, "What nigger is that?" "I said I don't know." "It is Isaac Cahn." Thereupon he said, "I am going to kill him. I am going to kill him before the night is out." "I said 'let that alone, you will get into trouble.' They repeated they were going to kill him before the night was out." Witness says about five minutes later he went to

Cahn's house which was close by to warn him, but when he reached it they informed him Cahn had been killed in the saloon.

The coroner testified the death of deceased was caused by a pistol shot wound. The bullet penetrated the left eye and was imbedded about two and one half inches back from the front. It went in almost on a level and ranged straight back.

Dominick Dezootti was the bartender that night. He testified that Cahn came into the saloon, purchased a can of beer and drank it and was standing by the stove. About fifteen minutes later Pollard and Harris, the defendants, came in, came up to the bar, and Pollard asked, "Where is the gander of Belvidere?" He answered that he knew no Gander. Harris asked, "Where is the bully?" Witness was talking to Charles Millman when he saw Cahn throw up his gun and he ran for the gun; as he ran Cahn was shot. He had reached him and got hold of one of his hands just as he was shot. He didn't see who shot, but Harris and Pollard immediately ran away. The patrol wagon took Cahn away before he died. Cahn didn't say anything when he drew his pistol.

Richard Taylor testified he knew all the parties. He was in the saloon when Cahn was shot. He said Cahn and Brown, another negro, had been talking ten or fifteen minutes when Harris and Pollard came in. Harris went up to Cahn crying and asked him why he said that to his mother. Cahn backed away and said, "I never said anything to your mother. Go on away from me." Brown also looked up and said, "Nobody said anything about your mother, Frank." Harris then stepped to one side a little and the shot was fired at Cahn by Pollard. Witness looked in the direction and saw Pollard lowering his hand from Millman's shoulder with the pistol in it.

Robert Carter was also in the saloon. He testified the defendants came in and went out and came again while Cahn and Brown and himself were talking. There were no words between Pollard and Cahn before Pollard shot him. He says Harris demanded to know what he said about his mother and Cahn denied saying anything. Harris continued to approach Cahn and Cahn backed off and pulled his pistol and told Harris to keep away from him. Pollard got in behind the screen, back behind Millman, and threw his gun over Millman's shoulder and shot Cahn. Sidney Reed corroborated Carter.

Dickson, another eyewitness, says Harris and Pollard came in. Asked the bartender, where are your fighting men. He said he had none. They took a drink and went out. Harris came back and walked up to Cahn with one hand in his pocket. Pollard came in behind him. Harris then began the conversation with Cahn and Pollard walked behind the screen and soon shot Cahn.

Millman, the owner of the building, was in the saloon. He says Pollard crawled between him and the screen and shot over his shoulder. He says Cahn had his pistol up, not aimed at anyone when he was killed. He heard someone in his rear say, "Shoot the son of a bitch," and instantly Pollard shot and killed Cahn.

To officer Murphy, who arrested both of them that night, they positively denied knowing who shot Cahn, until the next day Pollard admitted it. The defendants testified in their own behalf.

Pollard testified to Cahn drawing a pistol on him at the chitterling supper and to their leaving the house. He describes the scene at the saloon in these words: "Frank Harris, Will Barns, and I went into the saloon." "Q. Was anything said to Cahn when you went in there?" "No, sir. He pulled his gun, not

a word was said to him. I jumped behind Mr. Millman. I got him in front of me, between me and Cahn. Cahn had the gun leveled on me and I couldn't see any way to get out of the way from him. I tried every way I could. I got Mr. Millman in front of me to save my life. I immediately jumped behind Millman."

Harris gave this version of the affair. He says when they got into the saloon Cahn made some remark about his mother and he said, "What is that you said, Mr. Cahn? Don't you speak about my mother;" and thereupon Cahn stepped back, and pulled his revolver and used a bad expression. "He threw his revolver up and I backed against the bar or counter. I seen he didn't have the revolver on me. He threw it down like that, and by that time I saw Millman slipping backward and forward and Pollard kept behind him and he stepped to the left and I saw Pollard reach over his shoulder and fire."

I.   The instructions were full and defined murder in the first degree in terms often approved by this court. The court also gave an instruction on self-defense which has been again and again approved and was exceedingly favorable to defendants in view of the fact that it was based upon Pollard's own evidence, which utterly conflicted with all the other evidence in the case. We say this much on the instructions because they are now challenged in the brief of counsel, but no exceptions were taken or saved to any instruction in the criminal court and it is now too late to make them.

II.   Neither can the assignment that the court erred in excluding the evidence of H. Clay McDonald be considered for the reason that it was not made the ground for a new trial. Defendants, in their motion

for new trial, did not complain of the exclusion of any evidence offered by them.

III.    There was no error in permitting the state to show that defendants, on the night of the murder, threatened to kill Cahn before morning.

IV.    In regard to the introduction and rejection of evidence: The first, second, fourth, fifth, sixth, eighth, ninth, tenth, eleventh, and twelfth points all relate to testimony offered and excluded by the court upon objection by the state and as already said the rejection or exclusion of evidence on behalf of defendant was not made a ground of the motion for a new trial. Aside from that, most of them appear too trivial for serious consideration, but they are not saved in such a way as to call for a review by this court.

V.    There was no error in overruling the motion for new trial on the ground of newly discovered evidence. The affidavit of the brother of one of the defendants filed for this purpose fell far short of complying with the requisites of the law in such cases. *State v. Welsor*, 117 Mo. 570.

VI.    The evidence throughout shows a common purpose in these defendants on that night. At the supper when one of them was detected in a suspicious act and warned not to disturb that meeting, with one accord they asserted "they were looking for their rights," an exceedingly significant statement when taken in connection with their previous difficulty and departure from the house and their subsequent threats to kill the deceased when they saw him preceding them to the saloon. When they appear in the saloon, they each inquire of the bartender for "the gander or bully of Belvidere," an illusion evidently to the deceased. They were both seen to retire together and hold a parley on the street and immediately upon their return to the saloon Harris with his hand in his pocket

and an assumed cry over some remark about his mother which had not been made, or at least not heard by any of the many witnesses in the immediate neighborhood of deceased, approaches deceased in a threatening manner with the challenge that he must not talk about his mother. The deceased was seen to back off from Harris and warn him to stand off, when he was suddenly shot by Pollard from his ambuscade behind Millman. That there was ample evidence to show a preconcerted agreement between Harris and Pollard to provoke Cahn into some threatening act and then kill him we think is abundantly established. That deceased was not the aggressor is beyond the cavil of a doubt; that he was not pointing his revolver at Harris, Harris himself testifies, and the pretense of Pollard that deceased was endeavoring to shoot him is contradicted by every witness and fact in the case.

The evidence discloses a premeditated purpose to kill the deceased and its perpetration at a time when he was quietly talking with his friends apparently wholly unconscious of their design. The preparation by arming themselves with a deadly weapon; the pursuit and watching of their victim; the secretion of Pollard behind Millman, and Harris' conduct as a decoy, all point to the unjustifiable murder of which the jury convicted them and they could not have done less under the evidence. Certainly there is no such failure of substantial evidence as calls for any interference on that ground by this court. No error appearing, the judgment and sentence of the criminal court of Jackson county is affirmed and we direct the sentence of the law to be executed. SHERWOOD and BURGESS, JJ., concur.