STATE OF WYOMING,

*Plaintiff and Respondent,*

v.

JAMES J. GOETTINA,

*Defendant and Appellant.*

(No. 2302; May 15th, 1945; 158 Pac. 2d. 865)

424

426

For the Plaintiff and Respondent the cause was submitted upon the brief of L. J. O'Marr, Esq., Attorney General of Wyoming, Hal Morris, Esq., Deputy Attorney General of Wyoming, and Ray E. Lee, Esq., Assistant Attorney General of Wyoming, all of Cheyenne, Wyoming, with oral argument by Mr. Lee.

For the Defendant and Appellant the cause was submitted upon the brief and oral argument of W. A. Muir, Esq., and Edwin V. Magagna, Esq., both of Rock Springs, Wyoming.

## OPINION

Blume, Chief Justice.

In this case the defendant, James J. Goettina, was charged in the District Court of Sweetwater County, Wyoming, with murder in the first degree for killing one Frances Goettina, his wife. The defendant pleaded not guilty and claimed, upon the trial, that he killed deceased in self-defense, and further that the homicide was accidental. He was convicted of manslaughter and sentenced by the court. From that judgment he has appealed to this court.

The defendant was 56 years of age and the deceased 31 years of age at the time of the homicide herein. Defendant first came to Wyoming in 1913, worked in a coal mine until late in the year 1917, enlisted in the United States Army and went to England, France and Germany. After the war he returned to Rock Springs, subsequently went to Illinois for a period of time, but returned to Rock Springs in 1928, and since 1933 was engaged in conducting a saloon business, the place conducted by him being known as the Belmont Inn. He met the deceased and married her on September 10, 1935, and they lived together as husband and wife until in the spring of 1943. Deceased left her home on April 3 and went to Jackson, Wyoming, apparently with one George Brown. She took with her from the safe of the

Belmont Inn the sum of $900. Becoming apparently broke, she phoned defendant about May 24, 1943, to come to see her at Jackson, Wyoming, which he did. Two days thereafter they returned to Rock Springs but she subsequently went away again, and again returned to Rock Springs about June 24, 1943. In the meantime in May, 1943, the parties had made a settlement of their affairs. The deceased had wanted to obtain ownership of the Belmont Inn. The defendant refused on the ground that the Inn was his only way of earning a livelihood. Finally, the defendant agreed to pay her about $2200, in addition to the $900 which she had taken, $50 a month, and turn over to deceased the automobile owned by the defendant. The defendant further offered that he would make a will in favor of the deceased so that she would become owner of all of his property when he should die. The deceased agreed to the settlement as fair enough, and that she would never come back to the Belmont Inn. The $2200 was paid and the automobile transferred on the public records. The will, however, was not signed on account of the fact that W. A. Muir, Esq., Attorney at Law, and then acting as attorney for the deceased, refused to let him sign it at the time when he offered to do so on account of his intoxicated condition. A divorce suit was instituted by deceased against the defendant on May 23, 1943; the latter defaulted in the case. No judgment was ever entered therein and it was finally dismissed after the homicide had taken place in this case.

The homicide took place in the Belmont Inn about 1:30 A. M., July 1, 1943. A map of the building is in evidence. In the northeast corner is a small room, about 9 feet long by 7 feet wide. In the southwest corner of this room was a refrigerator, in the northwest corner a cooler, and a wash bowl on the north. South of this small room was the bar and its appurtenances, including a cash register and two drawers. The

bar was 27 feet long. The immediate incidents of the homicide seem to have begun behind the bar and ended up in the small room above mentioned, where, seemingly, the fatal shot was fired. During the evening of June 30, 1943, the deceased visited various places where intoxicating liquors were served, including the Belmont Inn, and she appears to have taken quite a number of drinks of straight whiskey and that she was in a rather intoxicated condition. She was at the Park Hotel with some of the witnesses in the case about midnight and caused these witnesses to return her to the Belmont Inn about that time. According to the witness Lexie Sanders, deceased left the Belmont Inn about 12:30 A. M. for a short period of time, saying that she was going to get a sandwich, and the defendant asked her if she would be back and she said she would. She returned, the exact time not appearing, and the witness saw her about 1:00 A. M. in the ladies toilet of the cocktail lounge. According to the defendant's testimony, however, she left about 12:30 A. M., saying that she would never come back "to the son-of-abitching place again." The Belmont Inn was closed about 1:00 o'clock A. M., July 1, and Lexie Sanders and Pauline Meyer, bar maids at the Inn, left about that time, the latter apparently leaving last and by the back door. At that time the deceased was in the cocktail lounge of the Inn, and she and the defendant were then the only ones in the saloon. Soon after 1:00 o'clock the defendant and the deceased were seen standing in front of the bar of the Inn and close to the front door by one Guido Frank. They apparently were arguing and Frank heard the deceased say: "Let me alone." Soon thereafter two shots were fired. At that time the deceased and the defendant were back of the bar in the Inn. One of the shots grazed the right arm and the breast of the deceased and entered the left arm close to the elbow. The bullet of this shot was found in the left arm after she had

been exhumed. The medical testimony shows that that shot was not fatal. The bullet of the second shot which caused the death of the deceased entered the back at the twelfth rib on the left side, three inches from the spine, posteriorly, came through the posterior wall of the stomach, striking a portion of the lower left lobe of the liver; then through the diaphragm, through the lung cavity, through the left chest at a point four and one-half inches from the mid-sternal line between the fifth and sixth ribs, and through the left breast, emerging at a point one-half inch below the left nipple. The bullet was subsequently found in the north wall of a small room in the northwest corner of the building 3 feet and 10 inches from the floor. There were quite a lot of blood stains on the front and sleeves of defendant's shirt. He had no coat on, and the evidence shows that he had not been drinking during the evening and was sober.

Immediately after the shooting, about 1:38 A. M., the defendant called Mr. Erlewine, the Chief of Police of Rock Springs, who arrived on the scene shortly thereafter. Mrs. Goettina was sitting on the floor, somewhat slumped down, "she was lying down, sitting with her feet in front, on the floor." She was still living and was taken to the hospital where she died on the morning of July 2 ,1943. Mr. Erlewine testified that the defendant, when he called him over the phone, stated: "Come on over to the Belmont,—I just killed Frances," and that he later said when he saw him in the Belmont Inn: "I killed her, and there she lays back there; there is the gun I shot her with," showing him the revolver which was lying on a shelf in which were contained two empty cartridges and four loaded ones. The knife in evidence, hereinafter mentioned, was lying on the floor in the small room. The witness Pitchford, who was with Erlewine when the latter entered the Belmont Inn, testified that when the defendant opened

the door to the saloon, he made the remark that he had shot the deceased, and that she was on the floor back of the bar. The witness Hansen, who also was there at that time, testified that he put the defendant under arrest and the latter stated: "I had to do it; she was coming at me with a knife, and I put two into her." Taking the witness into the back room, defendant stated: "There is the knife she had, and there is the gun I used; that is the gun that killed Lonzo Hunt." The witness further testified that the defendant acted somewhat uncertain and muddled, dropped his keys a few times when leaving the Belmont Inn, but otherwise acted like a normal man. About three hours thereafter, defendant made a statement to the County Attorney in the presence of Charles E. Krieger, policeman of Rock Springs. The statement, signed by the defendant, shows that he was warned that it must be voluntary on his part; that he did not have to make the statement except with his own free will, with the understanding that anything he might say could be used against him in a criminal proceeding. The statement, aside from the formal parts, is as follows:

"Q. State your name in full. A. James J. Goettina. Q. What is your wife's name? A. Frances Goettina. Q. Now tell me in your own words, slowly, just what happened. A. I am closing up my place, the Belmont, in the morning of July 1, 1943, at about one o'clock in the morning. How she got in the place I don't know, but I told the people to get out. After everyone else was out, she was in the place. Q. Where in the place were you? A. I was closing the front door and when I looked around I saw her, in the middle of the place. We started to quarrel and she wanted me to serve a drink and L wouldn't do it. She dared me and she grabbed up a lemon knife and made two or three passes at me and I reached over in the drawer near the end of the bar and got my gun and I shot right now. Q. How many times did you fire the gun? A. If I'm right I shot her twice and I set the gun on the shelf and called the Chief of Police. And the knife is on the floor. Q. What kind

of gun was it? A. 32-20, and that was the first day I have it in the place for ninety days anyway. I brought it because I was threatened by other parties, not my wife. Q. Did she strike you with the knife, Jim? A. She attempted to but had no chance. Q. Was anyone with you when you had this trouble and when the shooting occurred? A. No, not a soul. Just about three or five minutes before there were people in but not then."

The witness, Tangen, a ballistics expert, testified that there were no powder or gas marks on the clothing of the deceased, and that the shots from the gun which hit the deceased must have been fired when the deceased was at least 5 feet away from the defendant. Various experiments were made by the witness, and a number of exhibits introduced to show that the shots which were fired were not what are called "contact" shots. But these exhibits are not before us, so that we are unable to judge the full force of the testimony of the witness. Exhibit 13 was a slack jacket worn by deceased. Experiments were made on other cloth, but the witness testified that the kind of cloth would make no difference; that powder will adhere to any material. Later, on the morning of July 1, 1943, defendant stated to Pat Lapenske, Deputy Sheriff, while in jail, referring to the gun, as follows: "I didn't know it was there, I haven't had a gun in the place for a long time, and I brought it up, wrapped in a newspaper, and I laid it on the shelf on the back bar. She (deceased) made a run for the drawer where I used to keep the gun, and of course, the gun not being in there but wrapped up in this newspaper on the shelf, she didn't know it, and I beat her to it." On the same day he had a talk with the Sheriff and one John Terrell, who testified that they took the defendant to the Belmont Inn on the morning of July 1, 1943; that the Sheriff asked the defendant where he had the gun; that defendant pointed to a drawer directly north of the register and said, "Over there." The witness Terrell continued: "He (the de-

fendant) turned around them and pointed to a draining board under the bar and said, 'She got the knife over there,' and he said he took the knife away from her and she turned around jerked the drawer open and grabbed the gun with both hands, and he said he got hold of the gun, but didn't have a good hold on it, and he said they scuffled from where he was standing, or close to where he was standing, to a point just inside the small anteroom at the north end of the bar, or galley-room, as I believe they call it, and he said it went off, and he said, "I didn't think she was shot,' and she sat down on the step ladder over there." The Sheriff testified that he also stated at that time that defendant said that it was the first time that the gun had been in the Inn in months. One of the bullets that had been fired had gone into a board through some sheeting and dropped down on the floor.

The record before us shows that the deceased was a heavy drinker of whiskey, and other intoxicating drinks; that at times, at least, she became mean and vicious, and that she was drunk, or had been drinking intoxicating liquors, on the occasions hereinafter mentioned. If we are to credit the numerous witnesses, who testified on behalf of the defendant, her conduct, in fact, was shocking, particularly after June 24, 1943. That may partially be accounted for, perhaps, by the fact that she tried to obtain the ownership of the Belmont Inn. According to the testimony, she made numerous threats against the defendant and made several attempts to take his life. That does not alone appear from the testimony of the defendant, but from that of other witnesses. The defendant testified that about October, 1942, she threatened to kill him with a gun; that on February 24, 1943, she came into the saloon to get more money, which he would not let her have; that she shot at the defendant twice with a small gun, one like that owned by George Brown; that on March 13

or 14, 1943, she snapped a gun at the defendant, and that the latter grabbed the gun, took it away from her, and that she then slid down on the floor; that she was quite drunk at the time. On April 3, 1943, she was in the Belmont Inn before the defendant arrived and as soon as he came in, she pulled a gun on him. The day before the homicide the deceased came to the front door of the Belmont Inn and said: "Let me in or I will shoot my way in through the place." The defendant let her in, grabbed her purse, and he found a gun in it; he put it on the cash register, and later in the drawer next to it. This was the same gun which was used at the time of the homicide. The witness, Huffman, corroborated the incident above mentioned in February, 1943. He stated that: "She just started commencing to raise hell and she walked back towards the phone, and when she did that Jim (defendant) came on up, and she said, 'You son-of-a-bitch, I will get it one way or the other,' (probably referring to the ownership of the Belmont Inn), and he started backing up, and she pulled a gun out of her purse and she fired one shot back in the back there, and then Jim started walking around to the front of the bar; the defendant started talking to her and she backed up between us and fired another shot; defendant dropped down on the floor."

One Flora Fain corroborated the incident in March, 1943. She stated: "Well, she came in through the door, and she was supposed to have been working there, and she came in, and Jim (defendant) walked up to the door and asked her where she had been, * * * she had this gun in her hand and she made him go back to the back of the bar. I heard her say that she was going to fix him. She had the gun aimed at him, the defendant grabbed for her hand and they were scuffling for the gun, and in the scuffle she lost her balance and she slipped down on the box there; she fired the gun. The

gun was the one with which the homicide was committed or a similar one." The witness further testified that she had a conversation with the deceased and that: "She told me that she was tired of him and she wanted to go with this other fellow (George Brown), and she says, 'The only way that I can get out is to kill him, and I am going to kill him'." Witness further testified that at one time defendant and Brown were quarreling, and deceased said: "If you were half the man George Brown is, maybe I would think more of you." Deceased also told witness that she was going to help George Brown "get" him (the defendant); that she and George Brown lived together for 10 days. She said: "I am in love with him. I am going to marry George Brown. I am going to take everything he (defendant) has got when I go, if I have to kill the so-and-so I am going to do it and George Brown is going to help me." The witness, Fred Magagna, testified that sometime after the holidays in 1942-1943, the deceased said in the presence of defendant: "I will kill that Dago if he doesn't cut it out." It does not appear just what she referred to. The witness, Ben Julius, testified that in December, 1942, he heard the deceased state that, "she would kill that wop son-of-a-bitch," meaning the defendant. The witness, Lexie Sanders, said that sometime in June, 1943, she had a conversation with the deceased in which the latter stated that defendant wanted her, the deceased, to come back and live with him again and that if she did not she couldn't live with anybody else. Deceased said: "I think I will just go and kill the wop son-of-a-bitch, or Dago son-of-a-bitch." The witness, Pauline Meyer, testified that on June 23, 1943, deceased came to the Belmont Inn and stated: "I came back looking for trouble and the first son-of-a-bitch that sticks his head out is going to get it." The witness had seen deceased and Brown together. At one time she had a conversation with the

deceased. The latter asked the witness, if she (the witness) thought it was foolish for her to leave the defendant, and further stated that it wouldn't make any difference if she did get a divorce, because she (the deceased) would be back, (and have the saloon) with Brown." The witness informed defendant of this conversation. The witness, Tony Drnas, testified that on the evening of June 28, 1943, the deceased was in his place of business several times; that later about 11:00 o'clock at night she came in there with the defendant; that she stated at one time during the evening, when the witness was fixing another drink: "I come down here to have some more trouble and I am going over there (to the Belmont Inn) and I am going to have some trouble." The witness, Elizabeth Diehl, testified that on that same occasion she heard the deceased say that she had come back looking for trouble. The defendant testified that on the same occasion deceased called him a coward son-of-a-bitch and Dago bastard. The witness, Martha Ferrero, who had done some housework for the defendant and deceased, testified that the deceased said to her one day that: "One of these days she was going to kill that wop, that she loved somebody else." The witness, Dick Wilson, testified that some time before July 1, 1943, he saw the deceased and the defendant and George Brown at his place in Pinedale and that at that time he heard the deceased say to the defendant: "Now you big son-of-a-bitch tell him (Brown) what you told me," that, thereafter, Brown walked in, that he had a gun, pointed it toward the ceiling and shot through the ceiling and then he walked over in front of the defendant. It appears that on June 30, 1943, the deceased wanted the defendant to go with her to Pinedale, but that the defendant refused to go. The witness Leonardi, corroborating the defendant, stated that while the deceased was getting some gasoline, she told the witness that

she was going to Pinedale; that she was looking for the big wop (the defendant) ; that she was going to give the old man (the defendant) his last ride; that at another time deceased told the witness that she was looking for the big wop (the defendant) and was going to bump him off. The witness, J. Warden Opie, testified that about midnight June 30, 1943, he saw the deceased in the Belmont Inn; that she was then cursing, using vile language and was quarrelsome, and that she hit the witness and broke his straw hat, apparently without any cause. He was corroborated by the witnesses Meyer, Sanders and the defendant. The testimony shows that defendant was a big man, but was afflicted with diabetes and had lost a lot of weight because of that. The deceased weighed 135 pounds and had been in good condition while living.

The defendant testified, aside from what has already been mentioned, or in greater detail, substantially as follows: Asked about the conversation on their trip from Jackson to Rock Springs, he answered: "The conversation was this, that she didn't want to leave the Belmont, and she offered me six thousand dollars. She said, 'it's half mine. Half of that place still belongs to me, and I will give you $6000 for the other half. Brown wants the place and he will run it, and I will give you $6000, and it will all be in my name'." Later he was asked: "How often did she tell you that she and Brown were going to take over that Belmont saloon? A. If that was mentioned once, especially from the first of March until she left, I doubt if she missed a day, because she wanted me to put the license in her name, or to have her name attached to the license along with mine, and there was no more getting along. It was either that I give her the place, like she says, or have her come in saying them things and calling me a son-of-a-bitch, and telling me they were going to bump me off, and telling me they were going to get me out of

there, and that Brown could pay me ten or eight thousand dollars, to get rid of me out of the place, because he carried $45,000 in his belt." The deceased came back to Rock Springs about June 24; went to the Belmont Inn and was quite intoxicated; after that she generally came back at night and started trouble every night and he had to stop her from doing so. Three nights before the homicide she called women all the names in the world picked up glasses and started throwing them at one Katherine Olsen; she insisted upon wanting another drink but defendant had closed and would not serve her. On Friday evening, June 25, 1943, she came in and stated that she was not satisfied with the settlement which the defendant made with her and that she and Brown were going to take over the Belmont Inn; that she and Brown would see that defendant had to get out whether by force or some other way. She was drinking at that time. She was also apparently accustomed to smoking marijuana cigarettes. Defendant never invited her to come in but on the contrary asked her to stay away, telling her that that would be better for both the deceased as well as the defendant. On the night of June 29-30, when she came into the Belmont Inn and stated that she would shoot her way through the place, she had the gun with which the homicide was committed; that this gun had previously been stolen by a colored porter and had been returned to defendant by Mr. Muir; that in May his place had been broken into and that he then missed the gun and that he did not see it again until the night of June 29-30 when he took it away from the deceased, and put it in a drawer behind the bar. She stayed in the saloon that night until about 2:30 or 3:00 A. M. At that time she asked the defendant to go outside with her, because she wanted to prove to defendant that George Brown had whipped him, leaving the inference that Brown at that time was in front of or close to the

saloon. Defendant refused to go, saying that he had nothing to do with Brown. Before that, about June 10, 1943, Brown, Pauline Meyer and defendant took a ride going to the so-called Log Inn. Brown was driving, turned off the road, got out of the car and stated to the defendant: "Here is where I am going to bump you off." Pauline Meyer jumped out of the car and hollered, and then Brown apparently changed his mind, put his gun in his pocket and said: "Come on and get in the car. You are safe, I will forget this." On the early morning of July 1, 1943, at the time of the homicide, after Pauline Meyer had left, the defendant, thinking that everyone had left, took a flashlight to look over all his place to see that no fire was left. Unexpectedly he heard the deceased coming out of the cocktail lounge. "She made a run when she saw me and so I asked her what she was doing and she said she came for a showdown. I asked her to forget it, leave, and go home; that it was no time to start any trouble." I asked her: "How did you get in here?" She said: "None of your damn business." Defendant was trying to tell her to get out and go home but she stated: "Let me alone." Defendant had not touched her or struck her, he had no gun in his pockets, in fact, never carried a gun in his life. "She came out of the cocktail room,—I was down towards the front end of the place and she came there and started quarreling, and I asked her two or three times to leave the place. I even went to the door and opened the door so she would go out, which she refused. She said she wasn't going out. She cussed and hollered and told me to let her alone, pretty loud, different times, so finally, then I thought things were kind of quiet, at least, we had quieted down, and I went over to the men's toilet, just across on the west side from the bar, and I walked in there to put the lights out—there was two lights in there—and when I came back and I looked, she was back at the bar already, and she was going

along pulling these drawers out, so I made a run over there, and I got over there as fast as I could and pushed her away from there, and as I pushed her away she got over toward the work bench, and she grabbed that knife, and I jerked her hand and throwed the knife away. * * * When I pushed her aside from opening the drawers she came right up here (indicating), she turned around with the knife, and I grabbed and jerked her, and the knife flew backwards across the room." Defendant at this time had no gun, either in his hand or in his pocket. All of a sudden she grabbed the drawer and got hold of the gun with two hands. She was trying to raise it, and "I grabbed hold of it, and as she jerked her hands out a shot went off right then and we were struggling and she went over toward the cooler, and then the two shots went off,—it seems to me all at once. I grabbed the gun and set it up on the shelf and she sat down." "Q. How much time elapsed between that first shot and the second shot? A. Well, I will tell you, you get in a struggle of that kind, and you can't tell whether it was a minute or a half a minute or a second, or more than that, but it seemed to me like it all hapenned so fast. I couldn't tell you, because it was an excitable thing, all at once, like, but she sat down there, and finally, after she got up from this ice box there, she sat on the stool, on what I would call a two-foot step-ladder, and she says to me, 'Jim, I am sick, take me over and open the back door and set me in front of the back door so I can get some air,' so I grabbed her up and I carried her over there and set her right there within 3 or 4 feet from the back door and opened the door. I said to her, 'Now see what a mess you got into now by doing this,' and she said, 'Jim, if you don't mention Brown in this—he had nothing to do with it, when the cops come here I will tell them that it is all my fault and to let you go'." Defendant then called the Chief of Police.

"Q. Do you know where you were standing when that second shot went off? A. It seems to me, when the second shot went off, this was all the struggling and the jerking and the pushing that was going on there, and it seems to me I kind of fell forwards against the wash bowl, and it seems to me she went towards the refrigerator. Q. Did you have hold of the gun when the second shot was fired? A. Yes. Q. Did she have hold of this gun just before the gun was fired? A. Yes. Q. Do you recall now whether or not you jerked the gun out of her hand or she jerked the gun out of your hand? A. We was jerking. I was left with the gun in my hand. Q. When the gun went off, the gun was left in your hand? A. Yes, sir. Q. Did you have your finger on the trigger? A. I couldn't say. Q. Was the hammer cocked, do you know. Was the hammer up, I mean? A. I am telling you in a case of that kind, I can't say, whether it was cocked or uncocked or whatever. Q. Do you recall whether you had your finger on the trigger or not? A. I couldn't say, because there was two hands on the gun when I first grabbed it. I just struggled along there with her over that gun. Q. How long did this scuffle take? A. It seemed like it was over in seconds. I had to grab the gun and take it away so I wouldn't be shot. I knocked the knife away so she wouldn't cut me. I knew what I was doing when I first started. I know I grabbed hold of her hand so I wouldn't be shot myself, because I knew if she got hold of it she would have shot me two or three times, and I didn't want to give her a chance to do anything of that kind. I didn't want to shoot her, but I didn't want her to shoot me, and I tried to grab that gun away from her. After the second shot I put the gun on the shelf."

Defendant also testified that he had been afflicted with diabetes for about four years; that he was in a sort of coma at the time when he made a statement to the County Attorney and does not remember anything about it. On cross-examination, he stated as to the occurrence of July 1, 1943: "She came and started up toward me and said, 'we are going to have a showdown,' and I tried to coax her to go home and she kept

shouting and telling me to let her alone that she wasn't going out." As to the struggle, he stated: "I made just one jerk, and we went over towards that ice box, and the first shot went off, and she fell with her right shoulder down on this cooler, and I just kind of jumped over, and the other shot went off. It was just a shove and a push, from here to here (indicating), and the shot went off, and we just kind of bumped around over there." "Q. Didn't the first shot cause her to let go of the gun?" A. It didn't seem that it did. She was still holding on. I know she fell this way (illustrating), and I fell against that wash bowl. I know she twisted around and I did, too, and I finally fell over against this bowl and that is the last I remember. It is hard to figure out. Q. Is that when the gun went off, when she was against that cooler? A. It seems to me they both went off, and as soon as it went off, it seemed like it was just another jerk and she fell. The gun was turned loose then and I just set it up here on one of these shelves. Q. Did she hand onto the gun when the first shot went off? A. It seems there was nobody turned loose until they both went off. Q. Could you say whether or not you were in front of Mrs. Goettina, or were you sideways or back of her? A. I couldn't say. I know she twisted around ,and I did too, and I finally fell over against this bowl, and that is the last I remember. It is hard to figure out." Asked whether he knew how far he was away from her when the shots were fired, he stated that he did not know; that he might have been right up against her. "Q. And you said she had her hands on the gun when the second shot was fired? A. As far as I know I think so."

Defendant denied having made the statement testified to by the witness Hansen, and stated that he told Mr. Erlewine, the Chief of Police: "There is the gun that she was shot with, and there is the knife, but I didn't mention who used the knife or anything to him

at all," and that when he called Mr. Erlewine over the phone he stated to him that: "Frances is shot and I would like to take her to the hospital." A few other facts will be mentioned hereafter.

I. It is contended that the court erred in admitting in evidence some photographs of the deceased which showed the bullet holes. As in Eagan v. State, 58 Wyo. 167, 128 P. 2d 215, and State v. Lantzer, 55 Wyo. 230, 99 P. 2d 73, we do not think that this was error. It enlightened the jury as to these holes, and looking at the photographs, we do not think that the admission thereof had any prejudicial effect on the jury.

II. Dr. Krueger testified to some discoloration which appeared on the body of the deceased at the time of the autopsy. This testimony was admitted without objection on the direct examination of the witness. He testified on the subject again on re-examination, and it was only then when some objections were interposed, and defendant asked finally that the testimony be stricken. These bruises or discolorations were along the region of the hip bone and the middle third of the tibia. The Doctor testified that these bruises might have been caused by lifting her, getting into an automobile while she was taken to the hospital, or bumping against a stool. He was testifying to her condition as he found it at the time of the autopsy. We are unable to see that any prejudicial error in this connection was committed. In fact, the bruises might, under the evidence, have been caused during the scuffle to which the defendant himself testified. See Wharton, Homicide (3rd Ed.) Sec. 606.

III. Counsel for defendant assert that the court wrongly excluded certain testimony, which it is claimed, tended to show that the deceased had a violent character and, hence, that she was the probable aggressor, and the defendant apprehended danger. There seems

to have been some misconception as to the law on that point. When the witness Olsen was on the witness stand and was asked a question, the Prosecuting Attorney objected, stating: "Character must be proved by character witnesses and not by specific acts. Counsel knows that." The court remarked: "That is my understanding of the law. Objection sustained." The rule announced by the court was the rule up to comparatively recent times, but has been modified in many states. In a note to 121 A. L. R. 290, it is stated that: "Although * * * the courts formerly excluded evidence of specific acts, the trend of the comparatively recent decisions, even in certain jurisdictions which formerly denied the admissibility of testimony as to specific acts, is toward the admissibility of such evidence." Cases from twenty jurisdictions are cited. In 26 Am. Jur. 394, after stating the former rule that specific acts would not be admissible to prove the character of the deceased, it is stated:

"However, according to the weight and the trend of modern authority, if, prior to the homicide, the defendant, either through his own observation or through information communicated to him by others, including the deceased himself, knew of other acts of violence of the deceased, he may, in support of his contention that he had reasonable grounds to believe himself in imminent danger from an assault by the deceased, introduce evidence of such prior unlawful acts of violence by the deceased. Such evidence bears on the question whether the defendant reasonably apprehended danger to his life or of great bodily injury."

And that is the rule adopted by this court in Mortimore v. State, 24 Wyo. 452, 474, 161 P. 766, in which the judgment of the trial court was reversed on account of the exclusion of such evidence.

Notwithstanding this misconception of the law, however, we find no prejudicial error in the record on that account. The witness Olsen was asked: "Q. Did you

and she have any trouble there that night?" The witness Ferrero was asked? "Q. Did she (the deceased) have any difficulty there that evening?" Objections to these questions were sustained, but no offer was made to prove the nature of the trouble or difficulty, and we are not advised as to whether or not they were of such nature as to show a turbulent or violent disposition. The witness Pauline Meyer was asked as to what was the mood of the deceased when she came back from Jackson and the witness stated that she was angry. This testimony was stricken. No details were offered to be proven, and merely being angry at something or other, without more, would not show that she was of a violent or turbulent disposition so as to effect the mind of the defendant in acting in self-defense, or showing the deceased to have been the aggressor. Nor was it shown that the defendant had any knowledge of these matters.

We might mention in this connection that counsel for the defendant argue that: "The trial court adopted the theory and rule, and compelled the defendant to abide by the rule, that the defense could not offer any evidence of any trouble or diffiuclty deceased had had, or any threats deceased had made against the defendant which were not made in his presence or communicated to him." But we do not find that to be true. The witness Lexie Sanders, for instance, was permitted to relate threats of deceased against the defendant, not in the presence of the defendant, nor did she testify that she communicated them to defendant. The witness also related the feelings of the deceased toward the defendant. Moreover, the court, in Instruction No. 29, permitted the jury to consider uncommunicated threats, as will appear from this Instruction hereafter set out in full.

IV. As already shown by the statement of facts, a good deal of testimony was introduced to show the re-

lations of the deceased and one George Brown, indicating that the deceased was in love with Brown; that perhaps on that account she sued for a divorce, and that she and Brown were desirous to obtain the ownership of the Belmont Inn from the defendant. Some of the evidence relating to Brown was excluded; for instance, that he was in the Belmont Inn a few days before the homicide and that he had a gun and fired some shots into the ceiling. So Pauline Meyer was not permitted to corroborate the defendant that about June 10, 1943, on a trip to the Log Inn, when she and defendant and George Brown were together in an automobile, Brown threatened to kill the defendant. Again the witness Von Rembow was not permitted to testify that she saw Brown at the hospital, after the deceased was taken there, and to state the request which the deceased made of the witness. It is claimed that the court erred in excluding the testimony of these witnesses. The court took the position that George Brown was not on trial, and that the testimony relating to him was irrelevant. The defendant's position is that he had the right to show the close relationship between the two and that they entered into a conspiracy to obtain the ownership of the Belmont Inn. Counsel have not cited us to any authority to show the relevancy of the testimony excluded from the standpoint of their theory. And the general rule seems to be to the contrary. It is stated in 40 C. J. S. 1118:

"Evidence is inadmissible to show a difficulty between accused and a third person in no way connected with the victim or offense, or to show accused's state of mind toward such a person, or to show threats made against accused by a person who was not present at the homicide and who is not shown to have been acting in concert with deceased."

In Clemmons v. State, 18 Ala. App. 650, 94 So. 245, the court stated:

"The rulings of the court on the admission of evidence as to what took place between the defendant and a third party, at a different time and place, were manifestly free from error, and testimony as to a difficulty between defendant and a third party was also properly excluded."

In Morell v. State, 18 Ala. App. 243, 91 So. 501, the court stated:

"Evidence of threats made against the defendants by third parties not present at the assault, and who took no part therein, was not admissible. State v. Taylor, 126 Mo. 531, 29 S. W. 598; State v. Anderson, 4 Nev. 265."

In the Missouri case just cited, the court said:

"Defendant complains that he was not allowed to prove that one Kearney, who was not present at the homicide, had threatened his life, and this as a justification for carrying the pistol. The court properly excluded this. For the purposes of this trial it was wholly immaterial that Kearney had threatened his life, as Kearney was not present and had no part in the killing."

In Douglass v. State, 44 Ariz. 84, 33 P. 2d 985, it is stated in the syllabus that:

"Evidence of threats made against defendant by person other than the one for whose death prosecution was brought held inadmissible on trial for murder." The court stated: "We know of no case where such threats have been held admissible."

The testimony admitted perhaps indicates that the deceased and Brown acted in concert to scare the defendant into surrendering the Belmont Inn, but that is as far as the testimony goes, and the testimony excluded would not go any further. It does not show that the two acted in concert to commit the homicide on the morning of July 1, 1943, and there is some question in our mind whether or not the testimony would not show a strong motive for the defendant to kill the deceased,

when an opportunity to do so was offered, rather than show a justification or excuse for the act. It does not appear that Brown had a hypnotic influence over the deceased, so as to deprive her of acting as a free agent. Counsel for defendant suggest that perhaps Brown, too, was lurking somewhere in the Belmont Inn at the time of the homicide, putting the defendant in greater fear. But that is purely conjecture, and is not based on any evidence in the case. The relationship of the deceased and Brown and their desire for the Belmont Inn might be palliation, but could not be a justification or an excuse for killing the deceased. After careful consideration, we have not found any reason to hold that the court committed any prejudicial error against the defendant in connection with the matters here discussed.

V. It is argued that it is strange that the State did not obtain a dying declaration from the deceased; that if it had done so, the deceased would undoubtedly have corroborated the testimony of the defendant, and that she would have absolved him from any guilt. It is, of course, somewhat strange that no dying statement was obtained from the deceased. It is possible that the State did not entirely act fair. But the record does not show whether the deceased wanted to make a dying statement, or was in condition to make one, or made one, or was asked to make one. Part of the statements of the witness Von-Rembow, a nurse, who took care of deceased for a time at the hospital, indicates that she was in condition to make one; part of it indicates the contrary. In view of the record before us we are not able to see that there is any force in the argument of counsel on this point.

VI. Defendant testified that he had had what is called an insulin shock in July and October, 1942, and later; and that he had such a shock and a mild coma

after the homicide and at the time when his statement was made to the Prosecuting Attorney; that he did not recall that he talked to the latter; that he remembered little else that took place or what was said; that he was weak, shaking and trembling; that he was wet from hand to foot; that his hands were sweating. Thereafter, Dr. Roe was put up on the witness stand to testify in favor of the defendant. He was examined at length on the effect of diabetes of the kind with which the defendant was afflicted, and testified that the symptoms mentioned by the defendant were symptoms of an insulin shock; that an insulin shock may be mild or so severe that a person suffering therefrom may become unconscious, or his condition may be such that he does not know what takes place about him. The defendant sought to fortify the physician's testimony by reading from a standard authority on diabetes. He was not permitted to do so and this is assigned as error. Most of the courts, except it seems the courts of Alabama, do not permit the use of such text books as independent evidence, or to fortify the testimony of the physician on direct examination. 32 C. J. S. 427, 627; 6 Wigmore on Evidence (3d Ed.) 2, 4 Jones, Commentaries on Evidence, 3185-3194, 20 Am. Jur. 669-816. Both Wigmore and Jones, and Chamberlain on Modern Evidence § 860, rather severely criticize the general rule. Many writers on medicine know much more of a particular subject on which they write, and of which they have ordinarily made a life study, than a testifying physician who is permitted to base his testimony on those very books. Courts consult medical books. And it may be that the rule held by most of the courts is one of the errors of legal science, transmitted from generation to generation, and which, perhaps, needs re-consideration. We have never had occasion to pass upon the point and we hardly think that in view of the record before us, we are called upon herein to lay down a

definite rule thereon at this time. Dr. Roe testified that he did not see the defendant on July 1, 1943, or on the day preceding or subsequent; that defendant had not taken any insulin for a year or more; that his diabetes was not a "severe case." He was asked as to every kind of condition which might exist in the case of a diabetic, without, however, connecting the defendant with these conditions, except only in a few particulars. Part of the testimony was as follows:

"Q. Now, Doctor, assuming that an individual who had suffered from this particular type of diabetes went through a great deal of excitement and nervous strain and physical exertion, and was physically strained as well, and assuming that he suffered, as you used the word, an insulin shock or hyperinsulinism, and assuming that after that he laid down for a short period of time, say, perhaps an hour or an hour and a half, and assuming that he got up and was up for a period of an hour or so and then went back, and assuming that he went back and rested again, and then partook of food, would it be possible or probable that he would not be able to remember or recollect what had taken place during that interval that he was up? A. Yes, it would be possible.

"Q. Would it be probable, or could it be probable? A. Yes, it could be.

"Q. Now during that interval, assuming that that occurred, and assuming that he forgot what had taken place, and assuming one further fact there, that he made statements or entered into conversations, or even went from place to place, and assuming, of course, that he is suffering from insulin shock, would he appear to be reasonably normal to an individual who was not familiar with insulin shock? A. Yes."

It may be noted that the answers were rather indefinite, and based as they were upon an assumed state of facts, testified to by the defendant, which the jury might or might not believe, we cannot say that the physician's testimony was of much help to the defend-

ant. If that is true, we cannot say that the refusal to admit fortification of his testimony by a standard text book would be of importance.

VII. The court by Instructions No. 18 and No. 19, instructed the jury as to the law of circumstantial evidence. The correctness of the instructions as a whole is not questioned. But it is claimed that there was no room in this case for such an instruction. In one place of the brief, counsel state that there was no circumstantial evidence in the case. In another place they state that: "There may be some circumstances involved in this case surrounding the shooting of the deceased, but certainly there is no circumstantial evidence in the case to establish the defendant's guilt of murder in the first degree, murder in the second degree or voluntary manslaughter." The only *direct* evidence as to the homicide was that of the defendant, but the jury were not compelled to credit his testimony. In fact, his testimony did not fully explain the homicide at all. It is impossible to find from it how it occurred. He himself acknowledged that it was hard to explain, and he did not attempt to do so. All the testimony which is not direct is necessarily circumstantial. " 'Circumstantial evidence' in a criminal case is the proof of such facts or circumstances connected with or surrounding the commission of the offense charged as tends to show the guilt or innocense of accused." 7 Words and Phrases 182. "Proof by circumstantial evidence consists in proof of a fact by proof of surrounding conditions from which existence of the principal fact may be deduced. * * * 'Circumstantial evidence' is the proof of collateral facts and circumstances from which the mind arrives at the conclusion that the main fact sought to be established in fact existed." 7 Words and Phrases 189. The fact that the defendant was sober; that the deceased was intoxicated; that they were found talking together; that the deceased wanted to become owner

of the Belmont Inn; the peculiarity of the nature of the shot and the distance from which it was fired, — these and other matters constitute circumstantial evidence. We find no merit in the contention here discussed.

VIII. It is contended that the court, in Instructions 4, 6, 7, 8, 9, 10 and 11, erred in instructing the jury on the law of first degree murder and second degree murder in connection with an instruction on manslaughter, for the reason that there is no evidence in the case from which the jury could infer that the defendant was guilty of murder. They argue that such instructions had a tendency to merely give the jury an opportunity to compromise on the verdict to be brought in. That argument is not without force. See Runyan v. State, 116 Neb. 191, 216 N.W. 666. And in a clear case that fact should not be overlooked by the trial court. Instructions must be based on the evidence in the case and the trial court should, in the first instance, determine the degree of the crime which the evidence tends to establish and limit the instructions accordingly. 30 C. J. 398; Runyan v. State, supra. Whitehead v. State, 115 Neb. 143, 212 N.W. 35; Wharton, Homicide (3rd Ed.) Sec. 158. However, since the jury, except in a clear case, is the judge of the guilt or innocence of the defendant, it has been held that too great a burden in this connection will not be imposed upon the trial court, and that if there is any evidence at all showing the elements of the higher degree of crime, it is not error to instruct on such higher degree, although the verdict for such higher degree might be set aside as not sustained by the evidence; since it is only when the evidence without conflict does not prove the essential elements of the higher offense that it is error to submit an issue thereon. 4 Warren, Homicide (Perm. Ed.) 392; State v. Jackson, 103 Iowa 702, 73 N. W. 467. Furthermore, in 41 C.J.S. 294-296, it is stated:

"Error in instructing as to a higher degree of homicide than that of which accused is convicted is generally harmless. * * * In accordance with this rule, accused generally is not prejudiced by the giving or refusing of instructions as to murder in the first degree, or of error in the instructions relating to that degree, where he is acquitted of murder in the first degree and convicted of a lesser degree or offense, such as murder in the second or third degree. Error in giving or refusing to give instructions as to murder or giving erroneous instructions on that subject is generally not a ground for reversal where accused is convicted of manslaughter. . . .".

Numerous cases are cited to sustain the text, and very few cases are found in which the instruction on a higher degree has been held harmful when the defendant was convicted of a lower degree of crime.

We cannot say that the evidence is totally devoid of the elements of murder. The jury could find that he had a motive for killing her, since she had troubled him for a long time and wanted the ownership of the Belmont Inn. The defendant was sober; the deceased was drunk, rendering her, perhaps, more or less helpless. Defendant knocked the knife out of the hands of the deceased, and the jury might infer that he could have done likewise with the gun, if she in fact had the gun in her hands. There was testimony from which the jury could infer that the deceased never had the gun in her hands and that she was accordingly helpless after the knife was knocked out of her hands. Counsel lay a great deal of stress on the fact that the deceased was the aggressor; that she had no business in the Belmont Inn; that she was not invited; that defendant did nothing which would indicate that he wanted to shoot the deceased. These facts, of course, are important, but not conclusive. The mere fact that she was the aggressor did not justify the defendant in killing her, if she, without putting the defendant in peril, there-

after became helpless, and he knew it. The nature of the fatal shot, the entrance and exit of the bullet, show that the gun must have been in the hands of the defendant at that time, and that deceased was turned away from the defendant. The blood stains on defendant's clothing would seem to show that he was close to her after one or both of the shots were fired, but that may have been when defendant carried the deceased toward the door. It may be that the parties scuffled, and went down to the floor. But we cannot say, though they scuffled, even under the defendant's testimony, that it was necessary for him to shoot the deceased in order for him to protect himself, and if, when the fatal shot was fired, she had her back toward him, or nearly so, and especially if she was then five feet away from him, the jury had the right to infer, we think, that it was not necessary and did not appear to be necessary to him as a reasonable man, particularly if, as already stated, and as the jury might infer, she was more or less helpless by reason of her intoxicated condition. Nor is it clear that such a shot was accidental. The defendant testified that he had had diabetes for about four years, and counsel claim that he was weakened on that account and want us to infer that he was incapacitated physically. But the jury were better judges of that than we would be since they saw him on the witness stand and could judge of his physical strength. The statement to the sheriff, as testified to by the latter; the statement to the depuy sheriff, Lepenske; the statement made to Hansen, and the statement made to the county attorney, do not show that the fatal shot was either accidental or in self-defense. Counsel for the defendant claim that these statements are not inconsistent with the testimony of the defendant, but we think that, fairly considered, the jury had a right to interpret them differently. Counsel were not too confident on the trial of the case that the state-

ments were consistent with his estimony, for they sought to show that the defendant did not, and on account of his diabetes could not, know what he had said. The defendant put a physician on the stand to corroborate that condition, but about all that the witness would state was that it was possible that such condition existed. Without discussing the evidence further, which has already been set out, we think that the court did not err in connection with the contention here made, and that in this instance the instructions on murder in the first and second degree, should, in accordance with the general rule, even though they should not have been given, be considered harmless. And from what we have stated, it follows, we think, that the further contention of the defendant that there was not sufficient evidence to convict the defendant of manslaughter, must be overruled. We do not think that the jury were compelled, under the evidence, to find that the killing was necessary or appeared to defendant to be necessary or was accidental. We are inclined to think that they brought in a verdict of manslaughter because of the apparently utter worthlessness of the deceased, which counsel for the defendant presented to the jury in a masterly manner, and because of the extreme provocation which she had given to the defendant, which, as counsel not unjustly say, had driven him to distraction. But, of course, merely because the deceased was worthless, did not, as the court rightly stated to the jury, justify the defendant in killing her, and goes more to the punishment rather than to the guilt of the defendant. Counsel seek to apply the rule in the case of Eagan v. State, 58 Wyo. 167, 126 P. 2d 215, in connection with the point of credit to be given to the testimony of the defendant. But the two cases are not at all parallel. In that case there were no statements of the defendant inconsistent with his testimony; no testimony that the deceased was shot at a distance of five

feet and in the back, or nearly so; no evidence that the defendant was sober and the deceased intoxicated; no indications which permitted the inference that deceased was voluntarily shot after she became helpless.

IX. The court had given Instruction No. 14, as to the credibility of witnesses generally, and then also gave Instrucction No. 16, as follows:

"The court instructs the jury that under the law the defendant has the right to testify in his own behalf, but the credibility and weight to be given to his testimony are matters exclusively for the jury. In weighing the testimony of the defendant in this case, you have the right to take into consideration his manner of testifying, the reasonableness or unreasonableness of his account of the transaction and his interest in the result of the verdict as affecting his credibility. You are not required to receive blindly the testimony of the accused as true, but you are to consider whether it is true and made in good faith, or only for the purpose of avoiding conviction."

It is contended that the court erred in singling out the defendant in Instruction No. 16. This court has twice held that this is not error. Haines v. Territory, 3 Wyo. 167, 13 P. 8; Younger v. State, 12 Wyo. 24, 73 P. 551. That is in accord with the rule in the majority of states. 23 C.J.S. 828. Note 85 A.L.R. 538. We cannot, accordingly, hold that the giving of the instruction was prejudicial error. A strong minority, however, takes the opposite view. Note 85 A.L.R. 577. It not infrequently happens that witnesses for the prosecution are almost as much interested in the conviction of the defendant, as the defendant is interested in his acquittal. And the writer hereof believes that, generally speaking, it would be better and fairer not to single out the defendant in an instruction such as here mentioned, unless special circumstances should require it, or unless the defendant should ask an instruction as to his competency and credibility as a witness.

X. The defendant complains of the giving of Instruction No. 28, relating to self-defense. The court had already given four other instructions on the subject, which appear to state the law fairly. It is perhaps best to set out some of them. In Instruction No. 25, the court told the jury:

"The Court instructs the jury that the right to defend one's self against danger, not of his own seeking, is a right which the law not only concedes but guarantees to all men. The defendant may, therefore, have shot and killed deceased, either accidentally or intentionally, and still be innocent of any offense against the law. If, at the time he shot deceased, if you find from the evidence that he did so, he had reasonable cause to appreheld on the part of deceased, a design to do him serious personal injury, and there was reasonable cause for him to appreheld immediate danger of such design being accomplished, and to avert such apprehended danger, he shot, and at the time he did so, he had reasonable cause to believe, and did believe, it necessary for him to shoot in the way he did to protect himself from such apprehended danger, then, and in that case, the killing was not feloneous, but was justifiable, and you ought to acquit him upon the ground of necessary self-defense. It is not necessary to this defense that the danger should have been in fact actual or real, or that the danger should have been impending and immediately about to fall. All that is necessary is that defendant had reasonable cause to believe, and did believe, these facts. But, before you acquit on the ground of self-defense, you ought to believe that the defendant's cause of fear and apprehension appeared, at the time, reasonable to him."

Instruction No. 27 states:

"The court instructs the jury, as a matter of law, that if a person believes and has reasonable cause to believe, that another person has sought him out for the purpose of killing him or of doing him great bodily harm and that that person is prepared therefor, or is able to prepare himself with a deadly weapon or deadly weapons, and then later makes demonstrations mani-

festing an intention to commence an attack, and has commenced the attack, then the person so threatened with such an assault is not required to retreat, but he has a right to stand and defend himself and endeavor to secure himself from danger; and if, in so doing, it is necessary, or it appears upon reasonable grounds to be necessary, to assault his antagonist, the assault is excuseable upon the grounds of self-defense."

In Instruction No. 28, to which counsel object, the court told the jury:

"The Court instructs the jury that if you find from the evidence beyond a reasonable doubt that either or both of the shots which struck the deceased were wilfully fired by the defendant, then, before you can find that such shot or shots were fired in self-defense, it must have reasonably appeared to the defendant that the danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily harm, the shooting of the other was absolutely necessary; and it must appear also that the person killed was the assailant. If the defendant was unlawfully assaulted by the deceased, he had a right to repel the attack, using such force as reasonably appeared to him sufficient for that purpose, but he could not lawfully do more; and if the danger ceased before the fatal shot was fired, or if the defendant was not reduced to such apparent extremity or danger as, to him, reasonably appeared to be absolutely necessary for the defendant to shoot the deceased in order to save his own life, or to prevent him receiving great bodily harm, then, in such case, you cannot find that the act was done in self-defense."

We wish that the State had pointed out to us the source of Instruction No. 28, and whether or not it had ever been approved by the courts. It may be noted that it starts out with, "if you find from the evidence beyond a reasonable doubt that either or both of the shots which struck the deceased were *wilfully* fired by the defendant, then . . .", etc. In 68 C. J. 290, it is said of the term "wilfully", as follows:

"When used in criminal or penal statutes or the criminal law, and sometimes in pleadings in tort actions, when used to describe acts which shall be punished criminally, or with reference to violations of the criminal law, it has been said that the word 'wilfully' has an understood and accepted, a restricted, or well defined, meaning; that it is a strong word and is to be given ·some force and is most frequently understood, not in a mild sense, but as conveying the idea of legal malice in a greater or less degree, being ordinarily used in a bad sense, denoting evil intention, and being sometimes used to mean perverse, deliberate design and malice."

In other words, Instruction No. 28 told the jury that even though the defendant shot the deceased wilfully, that is to say with evil intent, still he could rely for his acquittal on self-defense. It would seem that there is an inconsistency in this respect. See Wharton, Homicide, Sec. 173. 1 Warren Homicide (Perm. Ed.) p. 411, states that: "The Revised Statutes of the United States defined manslaughter as the unlawful and willful killing of another without malice. The term wilfully here means done wrongfully, with evil intent." It would seem that under this authority, a person who commits a homicide wilfully is guilty of manslaughter, if malice and premeditation are absent. But the court in its Instruction No. 28, notwithstanding such wilful conduct, gave the defendant a full and complete and perfect right of self-defense. That, of course, was in favor of, rather than detrimental to, the defendant, and he could not complain thereof. Nor does he complain thereof. His counsel complain because the Instruction used the term "absolutely necessary", and claim that this Instruction is in conflict with the court's instruction on reasonable doubt. But counsel overlook the qualifying phrase that, "it must have reasonably appeared to the defendant that the danger was urgent and pressing," etc. If it did not so reasonably appear, then it would seem that it was neither necessary nor

absolutely necessary to kill the deceased. And put in that light, it may be noted that there is little, if any, distinction between these terms. It appears in Brown v. State, 168 Ga. 282, 147 S. E. 519, and other cases, that the statute of that state makes the right to kill in self-defense, in certain cases, dependent upon whether it is absolutely necessary to do so. In State v. Houk, 34 Mont. 418, 87 P. 175, an instruction using the phrase "absolutely necessary" was given in connection with self-defense. The instruction in that regard was criticized on that account neither by counsel nor the court. In Belt v. People, 97 Ill. 461, 472, the court had instructed that the jury, " 'must believe from the evidence that the danger was so great and pressing that in order to save his own life, or to save himself from great bodily harm, the killing of Oldham seemed to the defendant to be absolutely necessary.' " The homicide occurred during an encounter or combat between the defendant and the deceased, and the court said of this instruction: "The objection taken to this instruction is in the use of the words 'absolutely necessary,' instead of the simple word 'necessary.' In their application to the present case, we preceive no essential difference between the respective expressions." In the case of State v. Crawford, 66 Iowa 318, 23 N. W. 684, the court said:

"Counsel for defendant make objection to the following clause in one of the instructions given by the court to the jury, to-wit: 'One may lawfully do violence to the person of another, or even take the life of another, when it is absolutely necessary, or reasonably seems to be absolutely necessary to do so, for the preservation of his own life, or the protection of his own person from great injury.' The use of the word 'absolutely' in connection with the apprehended danger is objected to, as going beyond the rule which excuses homicide when the slayer, without fault, reasonably apprehends death or great bodily harm. We do not think the instruction is objectionable in this respect.

Its purport merely is that the danger must appear to the defendant to be actual, and absolutely require him to defend himself."

In view of these authorities, and the instructions as a whole, we cannot hold the use of the term criticized to be prejudicial error. Particularly is that true in view of the fact that Instruction No. 28 is based upon the premise that the right of self-defense as therein used could still be invoked even though the defendant shot the deceased wilfully. In order, however, to avoid any possible minconstruction, it would seem that it would be advisable not to use the term hereafter. It was said in People v. Carmichael, 198 Cal. 534, 246 P. 62, speaking of such an instruction that, "the elimination of the word 'absolutely' in the connection in which it is used in the instruction under review is recommended."

Counsel also object to the clause, "and if the danger ceased before the fatal shot was fired." They contend that it should read something like this, —"and if it reasonably appeared to the defendant that the danger had ceased." Counsel seem to be right. But taking all the instructions of self-defense into consideration, — and the jury were instructed to do so—we think that the thought of counsel was sufficiently conveyed to the jury, and that they were not misled. In Instruction No. 25, for instance, the court told the jury that, "it is not necessary to this defense that the danger should have been in fact actual or real or that the danger should have been impending and immediately about to fall. All that is necessary is that defendant had reasonable cause to believe, and did believe these facts." That seems to be so specific that no one could misunderstand it.

XI. Counsel for the defendant complained in the assignment of error, filed in the court below, of the re-

fusal to offer Instructions A, C, E, F, H, I and J. In their brief they waive the objections as to Instructions A, F, H, and J. They argue now that the court erred in refusing to give offered Instruction G, defining reasonable doubt, and Instruction B, reading: "You are instructed that if you find from the evidence that any other theory or conclusion is equally probable or tenable with that of defendant's guilt, then there is a reasonable doubt of his guilt and you should acquit the defendant." A similar statement was used by the court in connection with its instruction on circumstantial evidence, but not otherwise. The assignment of error, filed herein, does not mention offered Instructions B and G, and we cannot, accordingly, consider them. 4 C. J. S. 1717; Paul v. Harris, 40 Wyo. 261, 276 P. 444. We may mention that it is true that some of the cases, mostly early ones, require the giving of a correct instruction on reasonable doubt, but we find it stated that: "As a general rule 'reasonable doubt' need not be defined in instructions;". 23 C. J.S. 838. Language is not sufficiently specific so as to be able to clearly define mental processes or the force and depth thereof; they are felt more clearly than they can be defined. There is always a question whether a definition of reasonable doubt makes the meaning of the term any clearer than the term is in itself. True, some qualifying words may shed some light on the meaning. We may have a strong doubt amounting disbelief; the doubt may be weak. Reasonable doubt would seem to lie between the two extremes. Tennyson speaks of an *honest* doubt. Shakespeare stated that *"modest* doubt is called the beacon of the wise." In offered Instruction G, it is stated that: "A reasonable doubt is that state of mind which, after a full consideration of all the evidence, both for the state and the defense, leaves the minds of the jury in that condition that they cannot say that they feel an abiding faith amounting

to a moral certainty that the defendant is guilty of the charge as laid in the information." The court stated in Instruction No. 11: "The law will not justify the conviction of a defendant upon any degree of proof, however strong and convincing which does not create a certainty beyond a reasonable doubt." Thus the court required "strong and convincing" proof which itself seems to indicate that there must be a "moral certainty" of guilt in the minds of the jury. The court further required *certainty* beyond a reasonable doubt; which seems to be not any less pointed than *moral certainty*. See also State v. Eldredge, 45 Wyo. 488, 501, 21 P. 2d 545. In any event, we cannot reverse a case for not giving an instruction defining reasonable daube when we find no assignment of error in regard to it, any more than when no request for such an instruction is made, and we have held that when no such request is made, it is not error not to give one. Claussen v. State, 21 Wyo. 505, 133 P. 1055; Smith v. State, 17 Wyo. 481, 10 P. 847. Offered Instruction I, which related to the burden of proof, is not set out in the abstract of the record, which was certified by counsel as true and correct. It was evidently not considered of sufficient importance by counsel to include it. We may say, however, that we think that the Instruction was sufficiently covered by the instructions given by the court. That leaves for consideration only offered Instructions C and E. The former is as follows:

"The court instructs the jury that the law presumes the defendant to be innocent of the commission of any crime, and this presumption continues in his favor throughout the trial of the case step by step, and you cannot find the defendant guilty until the evidence in the case satisfies you, beyond a reasonable doubt, of his guilt. And, so long as you or any one of you, have a reasonable doubt as to the existence of any one of the elements necessary to constitute the crime of murder, the accused cannot be convicted of such crime."

The latter is as follows:

"In criminal cases even where the evidence is so strong that it demonstrates the probability of guilt of the party accused, but does not establish beyond a reasonable doubt the guilt of the defendant in manner and form as charged in the information, then it is the duty of the jury to acquit the defendant."

It may be noted that the latter part of Instruction C relates to murder and not to manslaughter, and we need not consider that any further since the defendant was acquitted of that charge. The statements in the remainder of that Instruction and in Instruction E are, we think, sufficiently covered by Instructions No. 3 and No. 11 given by the court. Instruction No. 3 reads as follows:

"The Court instructs the jury that the burden of proof rests with the State throughout the whole trial of this cause, and at no time shifts or is thrown upon the defendant. This case is not divided into two parts, one of guilt asserted by the State, and one of innocence asserted by the defendant. The defendant does not and is not required to plead affirmatively that he is innocent, but negatively that he is not guilty, which plea of not guilty puts in issue every material fact alleged against him, and on that issue and that alone, the jury are to try this cause."

Instruction No. 11 reads as follows:

"You have sworn to commence your investigation of the facts of this case with the presumption in your minds that this defendant is innocent of the crime charged in the Information, and to carry that presumption with you and in his favor throughout this trial until it is removed from your minds by evidence of his guilt, so strong, credible and conclusive as to convince your minds beyond a reasonable doubt that he is guilty, as charged in the Information. And unless the evidence is of such nature as to exclude from your minds every reasonable doubt of his guilt, then it is your duty, under your oath, to acquit the defendant. This presumption

of innocence in favor of the defendant is not a mere idle form to be disregarded by you at will. It is an important and fundamental part of the law of the land and should not, at any stage of your proceedings, be lost sight of or ignored. You cannot decide the issues of a criminal case upon the mere chance of whether the defendant be guilty. The law will not justify the conviction of a defendant upon any degree of proof, however strong and convincing, which does not create certainty beyond a reasonable doubt."

XII. The court gave Instruction No. 31 in the following terms:

"The Court instructs the jury that no previous difficulties or quarrels between the defendant, James J. Goettina, and the deceased, Frances Goettina, can be considered as a defense to the crime charged in the Information."

Counsel for the defendant argue that this instruction was error. No assignment of error refers thereto, nor is it set forth in the abstract of the record. We have already mentioned the consequences of such failure. It may not be amiss, however, to somewhat clarify the matter without going into details. The instruction, as an abstract proposition of law, is, of course, correct. Much more is necessary than mere previous threats or other previous difficulties or quarrels in order to justify an accused to kill. Durham v. State, 29 Wyo. 85, 210 P. 934. It is not true, however, that previous difficulties and quarrels may not be taken into consideration in determining the guilt of the defendant. In 40 C.J.S. 1230, it is stated:

"Where there is a claim supported by some evidence of self-defense, or, as it has been well stated, where the proof justifies the giving of a charge on the law of self-defense, accused may for the purpose of showing deceased to have been the aggressor, and the killing to have been necessary in self-defense, introduce evidence tending to show that deceased entertained hostile feel-

ings toward him. Thus he may show that there had been previous difficulties or quarrels between himself and deceased."

See also Decennial Digest, under Homicide, Section 147. An instruction eliminating competent evidence from the case would, of course, be erroneous. Instruction No. 31, given by the court, might give the impression, as contended by counsel for the defendant, that the court meant to include in the phrase "previous difficulties and quarrels," the various threats made by the deceased and her hostile demonstrations, and that previous difficulties had no effect on the case. Hence, the instruction standing by itself and without qualification, should not be given and under some circumstances would clearly be error. State v. Yates, 301 Mo. 255, 256 S. W. 809, and cases cited; State v. Malone, 327 Mo. 1217, 39 S. W. 2d 786. It is clear, however, we think, that the jury could not, in the case at bar, have understood that the court meant to exclude from their consideration the threats and violent disposition of the deceased, for the court instructed the jury to take them into consideration in five different instructions, namely, Instructions No. 20 to No. 22, both inclusive, and in Instructions No. 29 and No. 30. We shall set out a portion of these. Part of Instruction No. 21 is as follows:

"Evidence of the violent and quarrelsome disposition of the deceased, if you believe she was of that disposition, or threats alleged to have been made by her, if you believe that such threats were actually made, and that defendant knew of such disposition or threats, should also be considered by you as bearing upon the question as to whether at the time of the homicide defendant believed and had good cause to believe he was in peril of death or serious bodily harm at the hands of the deceased."

Instruction No. 22 is as follows:

"The Court instructs the jury that evidence has been introduced to you of the quarrelsome disposition of the deceased, and further tending to show that she was of a violent, quarrelsome and dangerous disposition while under the influence of intoxicating liquor. This was not admitted as tending in any way to justify her slaying by the defendant. This evidence is to be considered by the jury only as a circumstance illustrating the facts of the homicide and the surrounding circumstances and indicating the aggressor and the nature of the aggression; it being more probable that a person of violent, quarrelsome and dangerous character would make an unprovoked assault than a quiet and peaceable person would do, especially is this true if the person having a quarrelsome and violent disposition when under the influence of intoxicating liquor, had been, just prior to the unprovoked assault, drinking whiskey to excess."

Instruction No. 29 is as follows:

"The Court instructs the jury that if you believe from the evidence in this case that the deceased, Frances Goettina, had previously made threats upon the life of the defendant, James J. Goettina, or to do him serious bodily harm, you should consider these threats, whether communicated to the said James J. Goettina or not communicated to him, in determining who was the aggressor on the morning of July 1st, 1943, and if you conclude that Frances Goettina was the aggressor and that the defendant acted in self-defense, as explained in other instructions, then and in that event you should find the defendant not guilty."

Taking the various instructions into consideration, we cannot say, in the absence of an assignment of error on the point, and when counsel for the defendant did not consider it of sufficient importance to set it out in the abstract of the record, that there was a fundamental error committeed in giving Instruction No. 31, so as to cause us to reverse the case for that reason.

XIII. Counsel for the defendant claim that misconduct of the jury herein was sufficient ground for a new trial, the misconduct is based on the fact that

the deputy sheriff talked to some of the jurors. Four of the jurors made an affidavit as follows:

"5. That at various times during the trial, after the jury had been selected, the said Tom Lavery comingled with the persons selected to act as jurors in said cause and talked with various of them at various times;

"6. That on the 27th day of January A. D. 1944, which was during the time of the trial of said cause, and after the jury had been selected, the said Tom Lavery was with various of said jurors in said cause at the Hedley Cafe in Green River, Wyoming, that he comingled with them and talked with various of them, that he had dinner at the same table with the jurors, with a juror sitting immediately next to him on his right and another juror sitting immediately next to him on his left, and several jurors sitting immediately across the table from him."

These affidavits were made on March 30, 1944. The same jurors made additional and modifying affidavits, reading in substance as follows:

"That in Paragraph 5 of said affidavit executed by me on March 30, 1944, I stated that one 'Tom Lavery comingled with the persons selected to act as jurors in said cause and talked with various of them at various times', and I hereby desire to clarify and correct said statement, for, so far as known to me, the only time that Tom Lavery was with the jury, or talked to any of the jurors, was on the evening of the 27th day of January, 1944, when he had dinner at the same table with us,.all as is fully set forth in Paragraph 6 of my said affidavit of March 30, 1944;

"That at all times while the said Tom Lavery was with the jury, as aforesaid, the conversation was purely casual, and at no time was the above entitled case mentioned or referred to in any way by said Tom Lavery, the bailiffs, me or the other jurors, or anyone."

Tom Lavery, above mentioned, was a deputy sheriff. He made an affidavit that he was with the jury in the evening of January 27, 1944, because he had been in-

structed by the Sheriff to see to it that the members of the jury did not comingle with any of the patrons in the cafe, of whom there were a great many; that he did not in any way assist in the trial of the case and that he did not at any time mention the case to any member of the jury. One of the bailiffs in charge of the jury made an affidavit that he and the other bailiff, in charge of the jury, were within hearing distance of what was said on the evening of January 27, 1944, when Tom Lavery was with the jury, and that at no time was anything said concerning the case.

Section 33-1001 provides that: "In the trial of capital cases the jury shall not be permitted to separate, after being sworn, until discharged by the court." Section 89-1308 provides that after a case has been submitted to the jury, the officer having them in charge shall not suffer any communication to be made to them, nor make any himself, except to ask them whether they have agreed upon their verdict, unless by order of the court. Section 89-1305 provides that after the jury has been empaneled, "it shall be the duty of the court to order the jury into the custody of the sheriff, or other officer selected by the court, and the jurors shall not be allowed to separate or depart from the custody of the sheriff, or other officer, until they have been duly discharged, unless by the consent of the parties to the action." The rule relating to misconduct of the jury, in violation of the statute, is stated in Nicholson v. State, 18 Wyo. 298, 106 P. 929, as follows:

"Our opinion is that the reasonable and just rule lies between these extremes; and that when a defendant in a capital case has shown a separation of the jury, or an opportunity for other parties, and especially witnesses, to communicate with them in violation of the statute and it appears that the defendant was prejudiced, or that it does not appear that he was not prejudiced thereby, a new trial should be granted. The affi-

davits of the jurors are competent and admissable as tending to show what actually occurred and that no prejudice resulted from their conduct. Whether their uncorroborated evidence is sufficient to overcome the inference or presumption of prejudice arising from misconduct, we think, should be determined from all the facts and circumstances of each case; and where it fairly and reasonably appears in a particular case that no prejudice actually resulted from such misconduct, a new trial should not be granted on that ground."

In that case the separation of two of the jurors was sufficiently explained, and was held not prejudicial error; but the case was reversed because of a general intermingling of the jury with the public. In Cook v. Territory, 3 Wyo. 110, 4 P. 887, a homicide case, it was held that the separation of one or more jurors from the others, and their conversing with outside parties relative to subjects not connected with the case, they being all the while under the charge and vision and within the hearing of the proper officers and of each other, is not such a separation as would prevent a fair trial. In the case of Cronberg Brothers v. Johnson, 29 Wyo. 11, 208 P. 446, a civil case, in which the jury had been ordered to be kept together, the going home of one of the jurors was not, under the circumstances, held to be ground for a new trial. An affidavit was filed in that case that one of the bailiffs, in the presence of two jurors, made statements favorable to plaintiff. This was denied by eleven jurors and we held that no ground for a new trial had been shown. In Herman v. State, 33 Wyo. 58, 236 P. 507, a homicide case, the claim for misconduct was based on the fact that one of the jurors, while out of the presence of the other jurors, talked on the telephone to his wife, but it appeared that he merely asked his wife to look after a shipment of meat. It was held that no showing for a new trial had been made. In quite a number of cases it is held that it is not misconduct which will vitiate the verdict for

jurors to communicate with outsiders when nothing is said about the case. 23 C.J.S. 1025, and cases cited. The trial court had the right, we think, to conclude from the affidavits that Tom Lavery did not discuss with the jurors anything relating to the case, and, hence, we must conclude that no ground for a new trial has been shown. It is regretable, of course, that the sheriff, on his own responsibility, ordered Lavery to watch the jury, instead of getting an order of the court to that effect. Even suspicions that justice might be preverted should be avoided.

XIV. The trial of this case took place in January, 1944. The record on appeal was filed in the District Court on May 16, 1944, and the specifications of error on May 23, 1944. The record on appeal was filed in this court on June 19, 1944. On September 12, 1944, two jurors made an affidavit to the effect that the jury occupied two separate cabins in a cabin camp during the trial of the case, seven of the jurors occupying one cabin, and six the other; that the jurors went from one cabin to the other, and that they had the opportunity to talk to other people at the cabin camp; that during the trial, the jury were furnished with a radio by the sheriff; that one evening one of the bailiffs was absent for about half an hour; that the jury obtained a copy of the Rock Springs Daily Rocket and read the newspaper accounts of the trial. These affidavits and a copy of the newspaper accounts were filed in this court on September 15, 1944. On March 12, 1945, one of the jurors who had made an affidavit on September 12, 1944, filed an additional affidavit, somewhat modifying the statements which he had formerly made.

These affidavits and the newspaper accounts are not part of the record in this case and have not been made so. The trial court has never seen them and has not had an opportunity to pass upon the effect thereof. In

State v. Schloredt, 57 Wyo. 1, 111 P. 2d 128, we refused to consider an affidavit filed after the time that the record on appeal was permitted to be filed. In this case, the defendant had, by order of the court, to and including May 20, 1944, to file his record on appeal. We see no good reason why she should depart from the ruling in the Schloredt case. That case merely states the universal rule. 24 C. J. S. 611. It accords with the principle applicable to appellate courts. This court is a court of appeal from proceedings first had in the court below, and only in certain and specific instances is it vested with original jurisdiction by the constitution and the law. Some of the courts have considered on appeal in criminal cases facts conceded to be true by the State, though not appearing in the record. We have not investigated whether that would include facts which were not passed on by the trial court. Other courts will not consider facts not appearing in in the record, though agreed to be true by the State. 24 C. J. S. 613. The affidavits above mentioned are not agreed to be true by the State in this case, so we do not need to decide what we would do if such agreements were before us.

A few other, but minor, matters are mentioned in the the brief of counsel for the defendant, which we do not think necessary to discuss. We have carefully examined the record, and finding no reversible error, the judgment of the trial court is affirmed, without, of course, depriving the defendant of a remedy, if any, which he may have in the trial court by reason of newly discovered evidence which is not in the record before us.

*Affirmed.*

RINER, J., and CHRISTMAS, D. J., *concur.*